635 A.2d 1047

**Hazel STOVER, An Individual**

v.

**ASSOCIATION OF THORACIC AND CARDIOVASCULAR SURGEONS, Appellants.**

Superior Court of Pennsylvania.

Argued Feb. 23, 1993.

Filed Nov. 8, 1993.

Reargument Denied Jan. 20, 1994.

John W. Jordan, IV, Pittsburgh, for appellants.

Robert L. Potter, Pittsburgh, for appellee.

Before DEL SOLE, FORD ELLIOTT and CERCONE, JJ.

FORD ELLIOTT, Judge:

Appellants bring the instant appeal following the trial court's denial of their post-trial motions for judgment n.o.v.

14

and for a new trial. Additionally, the court added delay damages to the jury's verdict. Judgment in the amount of $1,347,609.53 was thereafter entered on June 23, 1992.

Appellee brought suit against appellants for failure to obtain her informed consent prior to an operation. This was the only legal theory pursued at trial and negligence was not at issue.

Appellee contracted rheumatic fever as a child. This illness can, and in appellee's case actually did, result in damage to the valves of the heart. Appellee's condition had deteriorated to the point that she sought medical attention from appellants, an association of surgeons. A physician with appellants, Dr. William B. Ford, informed appellee that she would need a heart valve replacement.

Dr. Ford only briefly reviewed the details of the necessary surgery with appellee. He testified that he discussed replacement valves with appellee, mentioning tissue valves and a mechanical valve known as the Beall valve.[1] He indicated that the tissue valve was relatively new and that the Beall valve had been used for many years. It was the Beall valve which was implanted in appellee. Appellee stated that she was apprised by Dr. Ford only that mechanical valves outlasted natural tissue valves. She denied that she was ever told of the risks attendant to the implantation of mechanical valves, and in particular the Beall valve, including the danger of the development of dangerous thromboemboli and strokes, as well as the consequent need to submit to a lifelong regimen of anti-coagulents.

1. Natural tissue valves have the benefit of behaving much like those we are born with. Unfortunately, these valves wear out in seven to fifteen years and must be replaced. Thus, they are not recommended for younger patients who might thereby be subjected to the need for multiple open-heart surgeries. Mechanical valves, on the other hand, last for the life of the patient and usually need not be replaced. Unfortunately, mechanical valves have their own drawbacks. Mechanical valves can cause the development of thromboemboli (blood clots), which may hold various dire consequences for the patient. The various mechanical valves available (ball and cage, tilting disk, non-tilting disk) also apparently each carry with them a different incidence of thromboemboli occurrence. The risk of blood clots requires that recipients of mechanical valves take anti-coagulent drugs for the rest of their lives.

Dr. Ford did not perform appellee's surgery. Another physician associated with appellants, Dr. Emir Zikria, actually conducted the implantation procedure. Dr. Zikria testified that he did not recall his meeting with appellee. Dr. Zikria did testify at some length as to the clotting risks involved with the mechanical valve implantation and with the need to take blood thinning agents thereafter. Dr. Zikria asserted that these risks would have been explained to the patient in the ordinary course of pre-surgical consultations, but that it was his customary practice to reiterate the risks immediately prior to surgery. He did not specifically recall reviewing these risks with appellee. Dr. Zikria also reviewed the consent form which appellee signed. His testimony notes that the form mentions neither the threat of thromboemboli, nor the need for anti-coagulents.

Following appellee's operation, she suffered multiple episodes of debilitating thromboemboli. These occurrences were found to be caused by the valve implanted in appellee. Appellee was left with severe, permanent brain damage. Subsequently, a natural tissue heart valve was implanted.

Appellee brought suit against appellants solely on the basis of lack of informed consent. Negligence was not pleaded. The jury returned a verdict for appellee to which the court added delay damages. Post-trial motions were denied and appellants appealed. On appeal, appellants' request for relief is limited to a new trial.

Appellants raise the following issues on appeal:

I.  In an action based solely on the doctrine of informed consent, is it error for the trial court to permit evidence of distinctions between different types of replacement heart valves and of the knowledge thereof in the medical community?

II.  Is evidence regarding what replacement heart valves are or are not in 'general use' relevant to an action based on the doctrine of informed consent?

III.  Should the trial court have answered in the negative the jury's question asking whether doctors are legally

16

bound to explain all the aspects of informed consent to the patient even if the patient waives that they do so?

We will address these matters *seriatim.*

Preliminarily, we note our standard of review as pertains to the review of a denial of a motion for a new trial:

> We may not reverse an order denying a motion for a new trial unless the trial court clearly and palpably abused its discretion or committed an error of law that controlled the outcome of the case. *See Thompson v. City of Philadelphia,* 507 Pa. 592, 493 A.2d 669 (1985); *Gray v. H.C. Duke and Sons, Inc.,* 387 Pa.Super. 95, 563 A.2d 1201 (1989).

*Sundlun v. Shoemaker,* 421 Pa.Super. 353, 358, 617 A.2d 1330, 1333 (1992).

Furthermore, as two of appellants' issues involve the admission of evidence, we observe:

> The admission of evidence is within the sound discretion of the court and the court's decision will not be reversed in the absence of a clear abuse of discretion. *Lewis v. Pruitt,* 337 Pa.Super. 419, 487 A.2d 16 (1985); *McCrery v. Scioli,* 336 Pa.Super. 455, 485 A.2d 1170 (1984).

*Hatbob v. Brown,* 394 Pa.Super. 234, 575 A.2d 607, 613 (1990).

The most difficult question presented by appellants in this appeal is that which they pose initially. Appellants couch the issue in terms of whether the trial court properly admitted evidence regarding the distinctions between various replacement heart valves because such evidence is irrelevant and prejudicial. However, the real issue which appellants pursue in the argument portion of their brief is that such evidence is inadmissible because the selection of a particular heart valve and its subsequent complications do not involve an issue of informed consent under Pennsylvania law.[2] Appellants rely on a recent case from this court, *Wu v. Spence,* 413 Pa.Super. 352, 605 A.2d 395 (1992), *allocatur granted,* 533 Pa. 613, 618 A.2d 402 (1992), to be addressed *infra* in support of

2. This argument was presented in a Motion in Limine prior to trial in an attempt to exclude the disputed evidence.

this proposition.[3] Moreover, the trial court characterized the central issue on appeal as follows:

> The major legal issue in this case is whether the doctrine of informed consent reaches the selection of the valve to be installed in the patient. Defendant contends that its physicians were required only to obtain the patient's informed consent to undergo open-heart surgery. The selection of the valve to be installed in the patient is a matter for the physician rather than the patient under Pennsylvania informed consent law.

Trial court opinion at 11.

Essentially appellants argue that informed consent does not (or should not) require a doctor to discuss with the patient all the different prostheses that are available for implantation as well as the advantages and disadvantages of each. Appellants believe that the choice of prosthesis, by medical common sense, must be left with the physician. Generally, we agree with this proposition where other available prostheses are not medically recognized alternative treatments. However, where other potential implants are recognized as medically sound alternatives, the attending physician must inform the patient as to the risks and benefits of those alternatives. To understand this conceptualization, a brief review of the law of informed consent in the Commonwealth is necessary.

Underlying the doctrine of informed consent in Pennsylvania is the intentional tort of battery:

> [W]here a patient is mentally and physically able to consult about his condition, in the absence of an emergency, the consent of the patient is 'a prerequisite to a surgical operation by his physician' and an operation without the patient's consent is a technical assault, *Moscicki v. Shor*, 107 Pa.Su-

---

**3.** Although this contention might better form the basis for a judgment *not withstanding the verdict*, the *Wu* case was admittedly unavailable to appellants at time of trial and the filing of post-verdict motions in this case. Therefore, we can only assume this to be reason why such a challenge was not raised in appellants' motion for judgment *n.o.v.* and is now presented in the context of a request for a new trial. Because we are affirming the trial court, we need not address further the remedy requested by appellants.

per. 192, 195, 163 A. 341, 342 (1932); *Dicenzo v. Berg,* 340 Pa. [305] at 307, 16 A.2d [15] at 16 [ (1940) ].

*Gouse v. Cassel,* 532 Pa. 197, 615 A.2d 331 at 333–34 (1992), *quoting Smith v. Yohe,* 412 Pa. 94, 106, 194 A.2d 167, 174 (1963).  As first annunciated in Pennsylvania, the consent required as a defense to an unauthorized operation encompassed little more than agreeing to the general nature of the surgical procedure.

In 1966, our supreme court expanded the scope of the consent which is required in the case of *Gray v. Grunnagle,* 423 Pa. 144, 223 A.2d 663 (1966):

> [S]ince the agreement between the physician and his patient is contractual in nature, for there to be a valid consent it must be clear that both parties understand the nature of the undertaking and what the possible as well as expected results might be. . . .  [I]t will be no defense for a surgeon to prove that the patient had given his consent, if the consent was not given with a true understanding of the nature of the operation to be performed, the seriousness of it, the organs of the body involved, the disease or incapacity sought to be cured, and the possible results.

*Gray v. Grunnagle* at 166, 223 A.2d at 674 (quoting R.E. Powell, *Consent to Operation,* 21 Md.L.Rev. 189 (1961)).

In *Cooper v. Roberts,* 220 Pa.Super. 260, 286 A.2d 647 (1971), this court went on to discuss the benchmarks by which informed consent should be judged:

> whether the physician disclosed all those facts, risks and alternatives that a reasonable man in the situation which the physician knew or should have known to be the plaintiff's would deem significant in making a decision to undergo the recommended treatment.  This gives maximum effect to the patient's right to be the arbiter of the medical treatment he will undergo without either requiring the physician to be a mindreader into the patient's most subjective thoughts or requiring that he disclose *every* risk lest he be liable for battery.  The physician is bound to disclose only those risks which a reasonable man would consider material to his

decision whether or not to undergo treatment. This standard creates no unreasonable burden for the physician. *Cooper* at 267–68, 286 A.2d at 650–51. This formulation has been described as the "prudent patient" standard.[4] It attempts to reconcile the tension between the patient's right to self-determination and the physician's responsibility to exercise sound medical judgment. *Festa v. Greenberg*, 354 Pa.Super. 346, 511 A.2d 1371 (1986), *allocatur denied*, 515 Pa. 580, 527 A.2d 541 (1987), and *Moure v. Raeuchele*, 387 Pa.Super. 127, 563 A.2d 1217 (1989), *reversed on other grounds*, 529 Pa. 394, 604 A.2d 1003 (1992).

Concluding this brief review, we defer to *Festa, supra,* which reviewed the social policy underlying the doctrine of informed consent:

> The underlying premise of this doctrine is that a physician is precluded from administering to or operating upon a mentally competent adult patient in non-emergency situations without his consent. 'Every human being of adult years and sound mind has a right to determine what shall be done with his own body.' *Schloendorff v. Society of N.Y. Hospital,* 211 N.Y. 125, 105 N.E. 92, 93 (1914) (Judge Cardozo). *See also* Dooley, *2 Modern Tort Law: Liability and Litigation,* § 34:49 *et seq.* (19); Louisell and *Williams, 2 Medical Malpractice: Physicians and Related Professions,* §§ 22:01 *et seq.* (1985). In order for the consent to be valid, the physician is duty bound to apprise the patient 'of such important matters as the nature of the therapy, the seriousness of the situation, the disease and the organs involved and the potential results of the treatment.' *Salis v. United States,* 522 F.Supp. 989, 997 (M.D.Pa.1981) (summarizing *Gray v. Grunnagle,* 423 Pa. 144, 223 A.2d 663 (1966).

> Imposition of this duty of full disclosure upon the physician is predicated upon the sentiment 'that unlike the physi-

---

4. The other standard commonly employed is the so-called "professional" standard. Under the professional standard, a physician is bound to disclose only those risks and alternatives which the reasonable medical practitioner in the community would have made in a similar situation.

cian, the patient is untrained in medical science, and therefore depends completely on the trust and skill of his physician for the information on which he makes his decision.' *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014, 1020 (1977) (citations omitted).

*Festa*, 354 Pa.Super. at 350, 511 A.2d at 1373.

In the instant case, appellants failed to obtain adequate informed consent on two bases: not only because they failed to describe the advantages and disadvantages of various replacement valves, but also, and perhaps more fundamentally, they failed to reveal the recognized risks of the valve which was actually utilized. It would be difficult to dispute that the heart valve was the *sine qua non* of this heart surgery.

While it is obvious that appellants should have disclosed the risks of the valve actually used, it is less obvious when and where a physician must disclose the risks of alternative prostheses. Under our view of the doctrine of informed consent, a physician would need to discuss alternate prostheses and their relative merits only when the other prostheses represent medically recognized alternatives. In such happenstance, the patient is entitled to weigh the risks of the alternative treatments. When, however, there are no other medically recognized alternate prostheses, or, for that matter, any other medically recognized alternate treatments, the doctor need only discuss with the patient any risks relative to the sole, viable prosthesis.

Appellants make much of the issue that it would be onerous to require a physician to inform a patient of the advantages and disadvantages of every available heart valve and then expect the patient to decide. We find that this argument rings hollow. The law of informed consent in this jurisdiction has always recognized the delicate balance which must be maintained between competing interests: the competent patient's right to medical self-determination and the need to alleviate the requirement that the physician disclose every risk to the patient for fear of liability. *Gouse v. Cassel, supra;*

*Informed Consent—A Fairy Tale?/Law's Vision,* J. Katz, 39 U.Pitt.L.R. 2 (Winter 1977).

This court has always deferred on the issue of medical judgment by requiring that only those facts, risks, and complications which would be material to a reasonably prudent patient need be disclosed:

> We do not believe that requiring physicians and surgeons to communicate material facts, risks, complications and alternatives to their patients creates an unduly burdensome requirement. A physician or surgeon need not disclose all known information; however, the physician or surgeon is required to advise the patient of those material facts, risks, complications and alternatives to surgery that a *reasonable person* in the patient's situation would consider significant in deciding whether to have the operation. Thus, the patient is assured that he will be provided with 'all the material facts from which he can make an intelligent choice as to his course of treatment, *regardless of whether he in fact chooses rationally.*' *Cooper v. Roberts,* 220 Pa.Super. 260, 266, 286 A.2d 647, 650 (1971) (emphasis added) (footnote omitted) (citing *Gray v. Grunnagle,* 423 Pa. 144, 223 A.2d 663 (1966) and *Dunham v. Wright,* 423 F.2d 940 (3d Cir.1970)).

*Gouse v. Cassel,* 532 Pa. at 203, 615 A.2d at 334.

Appellants determined that the mechanical Beall valve was the optimum medical solution for appellee's problem. It was required that appellee be warned of potentially dangerous thromboemboli which could be produced and that she would need to take anti-coagulents. Further, appellants were required to inform appellee of other medically recognized alternatives (of other heart valves currently in use) and to inform appellee of the risks inherent in their use. The jury found that this information was not given and that appellee should have been so informed. Under our doctrine of informed consent, then, appellants properly were found to have committed a technical battery and damages properly were assessed.

Appellants' argument also attempts to divorce the risks, and subsequent harm, generated by the implanted valve from the

potential risks of the implantation surgery itself. Were we only concerned with the patient's consent to the operation, we might agree that a physician need only explain in clear language what will be done to the patient. However, under the mandate of *Gray v. Grunnagle, supra,* the concept of *informed* consent requires more. As defined therein, the physician must also disclose material risks, complications, and alternatives to the treatment involved. Clearly, this requirement goes beyond merely a consent to the actual surgical touching. Instantly the treatment involved was heart valve replacement surgery. Clearly, one of the risks of this treatment was that the valve utilized would cause appellee's body to produce clots. The informed consent of appellee required she have this minimum of information.

In support of their argument on divorcement, appellants rely on a series of cases from this court which resolve the issue of informed consent within the context of drug therapy. However, we find these cases distinguishable on their facts.

In *Malloy v. Shanahan,* 280 Pa.Super. 440, 421 A.2d 803 (1980), husband and wife had brought suit on an informed consent basis. The doctor had prescribed a drug treatment for the wife's arthritis. The doctor failed to inform her that a known risk of one of the drugs prescribed was blindness. The wife became partially blind as a result.

Essentially, the *Malloy* court held that the doctrine of informed consent only applies in a surgical context. The court distinguished the situation which confronted it on the basis that it involved only therapeutic drug treatment. The court refused to extend the doctrine of informed consent to cases not within the realm of surgery. The court gave much weight to the underlying battery analysis of informed consent. Since there is no touching involved outside of the surgery milieu, there was no technical battery.[5]

5. As a point of interest, we note Judge Hoffman's comments in dissent. Judge Hoffman argued for the adoption of a negligence analysis for informed consent. In so arguing, Judge Hoffman illustrated the inherent weakness of the battery approach quite starkly:

*Boyer v. Smith,* 345 Pa.Super. 66, 497 A.2d 646 (1985), solidified the position of this court on this matter. The case before the court again concerned drug therapy rather than surgery and the court employed *Malloy* to rule:

> We are of the opinion that the doctrine of informed consent should continue to be limited in its applicability to only those cases involving surgical or operative medical procedures. In *Gray, supra,* our supreme court expressly grounded its adoption of the informed consent doctrine upon the legal theory that the performance of a medical procedure without a patient's informed consent constitutes a technical assault or battery. To now expand the doctrine's current applicability to cases involving the administration of therapeutic drugs would be to radically depart from, and indeed obliterate, the foundation upon which the *Gray* decision stands. Not only are we unpersuaded that such expansion is necessary, we consider ourselves bound by our supreme court's pronouncements in *Gray.*

*Boyer* at 72, 497 A.2d at 649. Clearly, what was dispositive for the *Malloy* and *Boyer* courts was the concern that informed consent be limited to the surgical theater.

Most recently, in the case of *Wu v. Spence, supra,* this court again declined to extend the doctrine of informed consent on facts where a technical battery had not occurred. In *Wu,* the patient was admitted to the hospital for treatment of a gynecological infection and was treated intravenously with the drug flagyl. The patient thereafter sued on the basis of lack of

> The theory that failure to obtain informed consent to treatment constitutes a form of negligence eliminates the artificial requirement that the physician engage in a 'touching' and thus a battery in order to be held liable. Under the negligence standard, a patient may recover for injury which results when a physician prescribes a drug without first obtaining the patient's informed consent. Under the battery theory, however, the patient's ability to recover would depend upon the manner in which the drug was administered. Thus, a patient who received a drug by *injection* without being informed of the drug's potential side effects could recover, while one who took the same drug *orally* without knowingly consenting could not recover. By following the trend toward negligence theory, we would eliminate such absurd distinctions from our law of informed consent.

*Malloy* at 447, 421 A.2d at 806.

informed consent in that the physician and hospital did not inform her of the risk of peripheral neuropathy as a result of this treatment. Like the cases before it, *Wu* firmly grounded its decision on the rationale that the therapeutic drug treatment under review did not involve surgery. *Wu* noted the reluctance of our courts to so extend the doctrine of informed consent.

Appellants correctly indicate that *Wu* also contained concepts derived from *Karibjanian v. Thomas Jefferson University Hospital,* 717 F.Supp. 1081 (E.D.Pa.1989), which argue that the patient was not entitled to recover because she was not claiming injury based on the method of administration of the drug but rather on the effects of the drug itself. *Karibjanian* made this same distinction. It is from this conceptualization that appellants are able to argue that they should not suffer liability where appellee's injury was occasioned by the thing implanted rather than by the act of implantation itself. While we will concede that *Wu* contained language to this effect, we note that *Wu* must be limited to its factual setting of drug therapy. *Wu,* in fact, specifically refused to expand the notion of informed consent in this regard because the milieu was one of drug therapy rather than surgery:

> The basis of an action for a lack of informed consent is that when a physician touches a patient a technical battery occurs, unless that touching is done with the patient's consent. *Id.* An emergency situation is, of course, an exception. The case law has consistently refused to extend informed consent to the administration of therapeutic drugs. *Boyer v. Smith,* 345 Pa.Super. 66, 497 A.2d 646 (1985); *Malloy v. Shanahan,* 280 Pa.Super. 440, 421 A.2d 803 (1980). *See also Keech v. Mead Johnson and Company,* 398 Pa.Super. 329, 580 A.2d 1374 (1990). This Court has consistently limited informed consent to a battery theory. We will not expand informed consent here.

In *Boyer,* the Court held that the doctrine of informed consent should be limited to those cases involving surgical or operative procedures. *Boyer,* [345 Pa.Super.] at 71–73, 497 A.2d at 649. The Court based this determination on the

fact that the Pennsylvania Supreme Court, in *Gray v. Grunnagle,* grounded the doctrine of informed consent 'upon the legal theory that the performance of a medical procedure without a patient's informed consent constitutes a technical assault or battery.' *Id.* The Court in *Boyer* felt that to expand the doctrine to the administration of therapeutic drugs would totally obliterate the standard set forth in *Gray,* and, therefore, felt bound by the decision of our Supreme Court in *Gray. See Levenson v. Souser,* 384 Pa.Super. 132, 557 A.2d 1081 (1989). We must agree with the Court in *Boyer.* Expanding informed consent to include therapeutic drug treatment would completely obliterate the standard set forth by the Supreme Court in *Gray.* We further believe that the adoption of a negligence standard would also completely obliterate the standard set forth in *Gray.* We feel duty bound to follow the law as established by our Supreme Court.

*Wu,* 413 Pa.Super. at 355, 605 A.2d at 397.

We find *Wu*'s analysis of *Gray* to be consonant with our discussion today. Contrary to appellants' advocacy, we find the facts of *Wu* to be distinguishable from the instant case and wholly consistent with the *Malloy* and *Boyer* line of cases. We also note the case of *Dible v. Vagley,* 417 Pa.Super. 302, 612 A.2d 493 (1992), *allocatur denied,* 535 Pa. 619, 629 A.2d 1380 (1993), where no informed consent was obtained prior to radiation treatments. The court found no liability because the treatments did not involve surgery. Likewise, the drug injected in *Wu* was administered outside of surgery. However, the device implanted instantly was done during surgery.

Furthermore, it appears that where surgical or operative procedures are involved, there must be informed consent as to injected drugs. In *Sauro v. Shea,* 257 Pa.Super. 87, 390 A.2d 259 (1978), a patient underwent surgery for the extraction of twenty-three teeth. During the operation, she was intravenously administered general anesthesia. Later, further anesthetics were given by inhalation. The patient died as a result of the anesthetics. This court reversed the trial court's refusal to charge the jury on the issue of the patient's informed

consent. It is worthwhile to note that it was not the method of administration of the drug that killed the patient, but rather the action of the drug itself. It is also noteworthy to mention that *Sauro* is easily reconciled with *Malloy* and *Boyer* because it involved surgery.[6]

Instantly, appellants have attempted to liken the fact situation *sub judice* to those informed consent cases involving drug treatment. However, the cases upon which appellants wish to depend do not involve surgery, while the instant case does. We are unwilling to concede that in a surgical context, the physician need not inform the patient of the dangers and alternatives of either drugs or implants. The doctrine of informed consent encompasses the entire surgical treatment and all of its recognized and material risks. Latent risks which are a direct result of the surgical treatment are not excluded. While the method of insertion into the body may, indeed, be the subject of informed consent, so also may the potential latent harm of any substance injected, inserted, or otherwise introduced into the patient's body and left there during surgery.

In sum, as to appellants' first issue, we rule that the fact situation *sub judice* is not analogous to *Malloy, Boyer, Wu,* or *Dible.* These cases all involved non-surgical settings. Because the instant device was surgically implanted, appellants were obliged to disclose attendant risks and alternatives. The situation is more akin to *Sauro* [7] than to the other drug cases.

6. We would be less than candid if we did not admit to a degree of artificiality in creating a distinction which limits the touching required for actionable informed consent to be the surgical cut. The court in *Wu* was also troubled by the need to draw such a distinction. However, it appears that until such time as our supreme court expands the technical assault definition, such artificiality must hold sway. Appellants have cautioned us that this is a hard case that has the potential to make bad law. However, it is our considered opinion that our resolution of this case is entirely consistent with long-standing legal precedent.

7. We also note *Friter v. Iolab Corporation,* 414 Pa.Super. 622, 607 A.2d 1111 (1992). *Friter* involved the surgical implantation of an experimental intraocular lens. However, the issue of informed consent presented was different and the present issue never arose. No analogy to the drug cases was made therein.

■   Appellants' second issue concerns the trial court's decision to admit evidence that the heart valve implanted in appellee was no longer in general use at the time of appellee's operation.  Appellants contend that such evidence is irrelevant in an action based upon lack of informed consent, in that it speaks more to the issue of negligence, and is highly prejudicial.  Simply put, we believe that this evidence was relevant and material.  We observe, as did the trial court:

> In an informed consent case, the plaintiff may present evidence of any information concerning alternative methods of treatment that the physician did not discuss with the patient and it is for the jury to determine whether this information would have been important to the patient.

Trial court opinion at 16.  The fact that other, more widely used valves with different risk factors were available as alternatives may have been deemed material by the jury to a patient's informed decision.  The fact that such evidence might also be relevant in the pursuit of an action for negligence does not negate its relevance in this arena.

Moreover, we fail to see the prejudice to appellants where the trial court repeatedly cautioned and eventually instructed the jury that they were to ignore any evidence that the medical care provided was not up to standards:

> You may find that some of the evidence which the parties introduced to help you decide these issues would also have a bearing on the issue of whether or not the defendant provided good medical care.  If this occurs, please remember that I permitted this evidence only because I believe it might help you decide the lack of informed consent claim.

> You are not to use any of the evidence offered in this case to evaluate the quality of the medical care that plaintiff received, because the quality of medical care that she received has nothing to do with this case.

> Even if plaintiff received the best medical care that could possibly be provided, defendants would be liable to plaintiff for any harm she suffered from the treatment if defendants failed to obtain her informed consent.  On the other hand,

in this case defendants would not be liable to the plaintiff if they obtained her informed consent even if they failed to provide good medical care.

Notes of testimony, 1/6/92 at 12–13 (from the court's opening comments to the jury). The court recalled these warnings in its final instructions:

Let me explain why certain evidence was presented in this case. This is the evidence as to whether or not as of January 1982 the Beall valve was regarded by the cardiac surgical community throughout the country to be no longer in general use.

Plaintiffs introduced this evidence only as part of her claim that the employees of the defendant medical association failed to furnish the material information that was necessary for plaintiff to make an intelligent choice as to her course of treatment.

Again I remind you that there is no claim in this case that Drs. Ford and Zikria provided medical care that was careless or incompetent because they elected to use the Beall valve.

Notes of testimony, 1/13/92 at 686–87.

Finally, we turn to appellants' last argument. During the course of the jury's deliberations the following question was submitted by the jury panel to the court:

Are the doctors legally bound to explain all the aspects of informed consent to the patient even if the patient waives that they do so?

Trial court opinion at 23. Appellants maintain that the court should have answered this question in the negative. We disagree.

The trial court viewed this question as actually potentially posing one of two possible inquiries:

One of the questions it may be is, May [sic] a patient exercise her rights under the informed consent doctrine by leaving the decision of which method of treatment to follow to her physician after the physician has complied with the informed consent law and has informed the patient of all

facts, risks, advantages and disadvantages of which a reasonable patient in the plaintiff's position would desire to be informed?

Or your question may be, May [sic] a patient waive altogether her rights under the informed consent doctrine and thereby excuse the physician from any obligation to make the disclosures required under the informed consent doctrine?

Trial court opinion at 24–25; notes of testimony, 1/14/92 (volume 2) at 739. The trial court answered the first question in the affirmative and resolved the second by ruling that there was insufficient evidence in the record to allow the jury to find that appellee had waived her right to full disclosure of risks and alternatives. We agree with this resolution.

■ The first question merely describes the doctrine of informed consent in operation. Once the physician has disclosed the risks and alternatives attendant to a surgical procedure, the patient is perfectly free to relinquish her right to make a choice. That course of action in itself constitutes her choice.

■ As for the second question, we agree with the trial court that the record contained insufficient evidence to make a determination that appellee waived her right either in part or in full to disclosure of risks and alternatives. The sole piece of evidence which appellants claim establishes appellee's waiver is an answer given by witness Doris Ketzel, a friend of appellee who had accompanied her to appellants' offices on the day Dr. Ford described the surgery to her. This exchange went as follows:

[APPELLANTS' COUNSEL:] Do you remember Hazel telling Dr. Ford that she wanted whatever Dr. Ford thought best?

[DORIS KETZEL:] Yes.

Notes of testimony, 1/7/92 at 253. This exceedingly brief item of testimony simply does not communicate the concept that appellee "had heard enough and preferred to leave further details solely to her physicians" (appellants' brief at 18). A

desire to leave the ultimate decision up to her doctor is not the same as a desire not to hear the options. It would be perfectly understandable for a patient to want to know the risks and alternatives of surgery and still leave the decision to her doctor. There is nothing in the record indicating that appellee stated anything resembling "I don't want to hear anything about the operation," or "Stop! You've told me enough. I'll leave it up to you." We find no merit to this last of appellants' arguments.

Accordingly, the judgment of the trial court is hereby affirmed. Jurisdiction relinquished.