## Piazza v. Myers

*Mark W. Tanner,* for plaintiff.
*Daniel F. Ryan,* for defendant Dr. Myers.
*Kevin H. Wright,* for defendant Dr. Davne.

DiNUBILE, *J.,* April 18, 1997—This opinion arises from the denial of post-trial motions and the entry of judgment on a jury verdict in favor of the physician defendants, Sanford H. Davne M.D. (orthopedic surgeon) and Donald L. Myers M.D. (neurosurgeon), and against plaintiff, Joan Piazza. Plaintiff's action against physicians centered on their use of orthopedic bone

screws and plates in the pedicles of her spine, in aid of spinal fusion surgery which took place June 30, 1987. Plaintiff's corporate liability claim against Thomas Jefferson University Hospital, where the operation took place, was dismissed by grant of summary judgment prior to trial.[1] This case came before the court as a "test case" in the statewide coordinated orthopedic bone screw litigation supervised by the undersigned.

The facts may briefly be stated as follows. Plaintiff had a long history of back injuries: prior to the 1987 implant surgery, plaintiff was involved in an automobile accident in 1978, a slip and fall in 1984, and a second car accident in 1986, all of which resulted in injury to her back. Plaintiff underwent spinal fusion surgery using the bone screws and plates in 1987. In 1990, she had surgery to remove the devices. Subsequently, in 1991, plaintiff was involved in a third automobile accident. Plaintiff pursued two theories at trial: physicians were negligent in deciding to use bone screws and plates in her spinal fusion surgery, and physicians failed to obtain her informed consent prior to performing this surgery.[2] Following an 11-day trial, the jury returned a verdict for physicians on both theories.

The primary issue plaintiff raises in her post-trial motions involves her informed consent claim. Specifically, plaintiff asserts that the court committed error in ruling, prior to trial, that the FDA status of the devices

---

1. Plaintiff also sued AcroMed Corporation, the manufacturer of the devices. A nonsuit was granted in favor of AcroMed at the close of plaintiff's case on grounds that a causal connection between use of the device and harm to Ms. Piazza was lacking. Plaintiff has not pursued her claim against AcroMed in light of the pending global settlement process.

2. It was undisputed that the implant surgery itself was well performed.

in question was not relevant to plaintiff's informed consent claim. Plaintiff sought to prove that the FDA had never approved these devices for use in the spine and that physicians never informed her of the FDA status of the devices in obtaining her informed consent. While evidence on this point was excluded at trial, plaintiff was allowed to prove that she was not otherwise advised of certain facts, risks, complications and/or alternative methods of treatment in support of her informed consent theory.

The pretrial ruling that plaintiff challenges was in accordance with the memorandum and order of March 8, 1996 issued jointly by the Honorable Louis C. Bechtle, the judge presiding over the multidistrict litigation of bone screw cases filed in federal court, and the Honorable Sandra Mazer Moss, then the supervising judge of the statewide coordinated orthopedic bone screw litigation. The judges granted partial summary judgment in favor of the physician defendants in all Pennsylvania and MDL cases following extensive briefing of the issues and a full hearing. This ruling effectively precluded plaintiff from pursuing an informed consent theory based on the fact the devices were not FDA-approved. A motion for reconsideration was subsequently denied on April 16, 1996. Plaintiff in the case at bar renewed this motion immediately prior to trial but again, the motion was denied.

It is clear that the FDA status of the devices is not proper subject matter of an informed consent claim in Pennsylvania. A physician is obligated to advise a patient of those facts, risks, complications, and alternative methods of treatment which a reasonable and prudent patient would consider material in deciding whether to undergo a proposed surgical procedure. Failure to do so exposes that physician to a cause of action

based on lack of informed consent. *Hoffman v. Brandywine Hospital,* 443 Pa. Super. 245, 661 A.2d 397 (1995); *Stover v. Association of Thoracic and Cardiovascular Surgeons,* 431 Pa. Super. 11, 635 A.2d 1047 (1993). In the case at bar, plaintiff's claim against the doctors centers on her allegations that physicians used the devices in her spine although the FDA never approved the devices for such use. The FDA, of course, is the Federal Food and Drug Administration, which regulates a manufacturer's labeling and marketing of its medical devices. Regulatory actions of the FDA pertaining to a manufacturer's labeling of a medical device do not constitute risks or complications of surgery using the device, nor do they constitute alternative methods of treatment. Whether the FDA approved use of the devices used in plaintiff's spinal fusion or failed to do so simply does not constitute an element of informed consent which is required to be disclosed.

Furthermore, the FDA does not regulate the practice of medicine. That is, a physician is free to use a medical device for a purpose not approved by the FDA if, in that physician's best medical judgment, such use will benefit the patient. Because off-label use of a medical device is a matter of medical judgment, a physician may be subject to medical malpractice liability for the exercise of such judgment. Plaintiff here in fact did so, albeit unsuccessfully. As the FDA is neither empowered nor qualified to regulate the practice of medicine, its regulatory actions are not relevant to a surgeon's decision to use the device.

Even assuming, *arguendo,* that FDA approval of a medical device is information that a physician must tell a patient in order to obtain informed consent, the exact status of the devices in question in the FDA regulatory process was not at all clear-cut. The evidence

presented at trial established that unequivocal disapproval of the devices by the FDA was far from apparent. AcroMed, through its agents, had attempted in 1985 to obtain FDA approval of its bone screws and plates for use in the spine under the "substantial equivalent" provisions of section 510(K) of the Medical Device Act; such approval would have permitted AcroMed to bypass the FDA's premarket approval process.

The FDA denied this application in November 1985, however, which occasioned a meeting in December 1985 between AcroMed representatives and FDA officials. At this meeting, the FDA informed AcroMed that it was permissible for the company to market the devices as "bone plates" and "bone screws" so long as the terms "spinal screw," "spinal plate," and "pedicle screw" were not used. If AcroMed sought to market its devices specifically for use in the spine, however, the devices would be subject to the premarket approval process. So, although AcroMed's devices were not approved for marketing as "spinal screws" and "spinal plates" at the time of plaintiff's surgery, it was entirely proper for them to be marketed under alternative labeling as "bone screws" and "bone plates." Consequently, the factual predicate forming the basis of plaintiff's arguments, namely, that there was a want of FDA approval, did not exist. Any information physicians could have given plaintiff concerning the devices' FDA status would have been unclear since the devices were never *dis*approved by the FDA. Advising plaintiff that AcroMed could not market the devices as pedicle or spinal screws and plates but could market them as bone screws and plates would have had little relevancy to plaintiff's decision whether to undergo spinal fusion using the de-

vices. It would have been an improper extension of informed consent theory to require physicians to inform plaintiff about "facts" which were anything but certain and relevant.

Plaintiff also asserts that the court's charge on informed consent generally was erroneous because the jury was instructed there must be a causal connection between any lack of informed consent and harm to the plaintiff. Specifically, the court directed the jury, if they found informed consent lacking, to proceed to a separate question inquiring what injury plaintiff suffered as a result. Pennsylvania case law is clear that to prevail under informed consent theory, there must be a causal connection established between the tort and harm to plaintiff. *Grabowski v. Quigley,* 454 Pa. Super. 27, 684 A.2d 610 (1996). In the case at bar, it was necessary for the jury to consider what injury might have resulted from plaintiff's spinal surgery in light of her history of back injury prior to and following the surgery. As the jury found plaintiff's informed consent had been obtained, however, this issue is moot.

Plaintiff also objects to this court's grant of summary judgment in favor of hospital prior to trial. Plaintiff's claim against hospital alleged corporate liability in accordance with *Domineck v. Mercy Hospital of Pittsburgh,* 449 Pa. Super. 313, 673 A.2d 959 (1996), and *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991), based on hospital's alleged failure to investigate the FDA status of the devices physicians used in plaintiff's spinal fusion surgery, and further, its alleged failure to inform plaintiff that the FDA considered these devices investigational when used in the spine.

Plaintiff argues that federal regulations required hospital to inform her that the medical devices physicians

proposed to use were "investigational." This theory clearly misconstrues the "investigational device exemption" provisions of the MDA. Under these provisions, the manufacturer of a new medical device may apply for FDA permission to conduct clinical investigations using the device; physicians who conduct these clinical trials are required by FDA regulation to inform their subjects that the devices are investigational, and hospitals where the trials take place are required to ensure compliance.[3] These obligations are imposed on the physicians and hospitals participating in IDE trials not by any common law but rather, by strict regulation of the FDA which has given approval for the investigation.[4] It is well established in Pennsylvania that a surgeon must obtain a patient's informed consent prior to the surgery; no one else, including a hospital, has such a duty. *Kelly v. Methodist Hospital,* 444 Pa. Super. 427, 664 A.2d 148 (1995); *Shaw v. Kirschbaum,* 439 Pa. Super. 24, 653 A.2d 12 (1994); *Foflygen v. Zemel,* 420 Pa. Super. 18, 615 A.2d 1345 (1992), *alloc. denied,* 535 Pa. 619, 629 A.2d 1380 (1993).

In the case at bar, plaintiff was not a participant in any clinical trial; the bone screw devices were implanted in her spine pursuant to the medical judgment of physicians, not pursuant to any IDE. Hospital never intentionally or knowingly assumed any duty to abide by FDA regulations in regards to plaintiff's surgery.

---

3. See *e.g., Lohr v. Medtronic Inc.,* 56 F.3d 1335 1339 (11th Cir. 1995), cited for this purpose only since overruled in part by the U.S. Supreme Court, *Lohr v. Medtronic Inc.,* 116 S.Ct. 2240 (1996). See also, *Green v. Dolsky,* 546 Pa. 400, 685 A.2d 110 (1996) for further discussion of the various aspects of the MDA.

4. 21 CFR §813.66(a)(6).

Consequently, the grant of summary judgment was proper. In any event, the issue is moot in light of the fact the jury verdict absolved physicians from liability. If plaintiff's physicians were found not negligent, how could the hospital be liable under a corporate liability theory for any failure regarding them?