**John MONTGOMERY and Marsha Montgomery, his wife, Appellants,**

v.

**Vitasta BAZAZ–SEHGAL, M.D., Executrix of the Estate of Kuldeep Sehgal, M.D., Deceased,[1] Greater Pittsburgh Impotence Center and Aliquippa Hospital, Appellees.**

Superior Court of Pennsylvania.

Argued April 6, 1999.

Filed Dec. 9, 1999.

---

1. Dr. Sehgal, originally an appellee, died while this appeal was pending. On October

12, 1999, we granted Dr. Bazaz–Sehgal's Application for Substitution of Personal Repre-sentative.

Peter J. Pietrondrea, Cranberry, for appellant.

Templeton Smith, Jr., Pittsburgh, for Bazaz–Sehgal, appellee.

Before POPOVICH and LALLY–GREEN, JJ., and CIRILLO, President Judge Emeritus:

CIRILLO, President Judge Emeritus:

¶ 1 John and Marsha Montgomery appeal from a judgment entered in favor of Sehgal, Greater Pittsburgh Impotence Center, and Aliquippa Hospital following a directed verdict in a medical battery [2] case. The court removed the case from the jury and entered a directed verdict at the close of the evidence after it found that because the Montgomerys had failed to present expert testimony, they could not, as a matter of law, prove entitlement to any but nominal damages. We reverse and remand.

¶ 2 It is well settled that "[o]nly in a case where the facts are all clear, and

there is no room for doubt, should the case be removed from the jury's consideration, and a motion for directed verdict ... be granted." *Correll v. Werner*, 293 Pa.Super. 88, 437 A.2d 1004, 1005 (1981) (citation omitted). "[O]n a motion for a directed verdict, the court must accept as true all facts and proper inferences which tend to support the contention of the party against whom the motion has been made and must reject all testimony and [in]ferences to the contrary." *Id.* Likewise, when this court reviews a trial court's decision to direct a verdict in favor of a defendant, "we must view the evidence presented in the light most favorable to plaintiff and determine whether plaintiff failed to prove his case as a matter of law." *Edwards v. Brandywine Hospital*, 438 Pa.Super. 673, 652 A.2d 1382 (1995).

¶ 3 Viewed in this light, the testimony shows that John Montgomery had difficulties with premature ejaculation and partial loss of erection prior to visiting Dr. Sehgal. However, he and his wife had sexual intercourse regularly and repeatedly on weekends when he was home from his job, long-distance truck driving; his erections were such that he was still capable of penetration. His primary difficulty was with premature ejaculation. After investigation and several injections which were of only temporary assistance, Dr. Sehgal determined surgery was necessary. The Montgomerys understood the operation would be on an outpatient basis and would involve clearing out a plaque blockage inside the penis. During the surgery, however, Marsha Montgomery was told that her husband would need to remain in the hospital as an inpatient. She was not told the reason, and she was initially puzzled and concerned. However, she was reassured that everything was fine and that this was not unusual.

¶ 4 When Montgomery woke up from anesthesia some time later in a hospital

---

**2.** Although sometimes termed "medical assault," such claims are usually grounded in battery.

room, a nurse placed before him a card. After some time, he picked it up and read it. It was a warranty card for a prosthesis. Montgomery asked the nurse whether this was an error, and she told him the prosthesis was inside his penis. He was incredulous. After contacting his wife, Montgomery telephoned Dr. Sehgal but was unable to reach him. The Montgomerys continued to call Dr. Sehgal for two days, but their efforts to speak with him met with no success until, on the third day, Dr. Sehgal appeared in John's hospital room. In the words of John Montgomery:

> I looked at him, I said where have you been, what did you put inside me, why. And he says to save you from a second operation. I told him, I said this ain't up to you, it is up to me to determine whether I want it in me or not and I don't even know what the hell he put in me.

Montgomery claims he now feels more "like a machine than a man," that he is encumbered and embarrassed by the device, and that the emotional quality of his lovemaking with his wife has suffered.

¶ 5 The Montgomerys' two claims at trial were lack of informed consent grounded in battery and grounded in negligence.[3] At the close of evidence, and after a discussion in chambers, the trial court granted a directed verdict for Appellees on the grounds that the Montgomerys' failure to present a medical expert precluded the jury from considering any evidence on the Montgomerys' battery claim. The court denied the Montgomerys' subsequent motion for a new trial; hence this appeal.

¶ 6 The Montgomerys present two questions for our consideration, framed as follows:

> Whether [Appellants'] testimony can go to the jury without expert medical testimony that the unwanted surgery performed by [Appellee Sehgal] (the insertion of the inflatable penile prosthesis) caused the physical and mental symptoms of which [Appellants] complain[.]

> Where [Appellant] suffers an objective, measurable, observable physical injury, are [Appellants] competent to testify as to the resulting physical, mental and emotional pain and suffering arising from the injury?

¶ 7 The Montgomerys were precluded by order of the court from presenting "liability expert witnesses" because they had earlier failed to file a timely pre-trial witness list. Due to this, they properly concede, they were unable to make out a case of informed consent based on negligence, for such a claim requires expert testimony during the liability phase.[4] *Sagala v. Tavares*, 367 Pa.Super. 573, 533 A.2d 165, 167 (1987).

¶ 8 As the trial court has stated to us, however, it was their choice not to present:

> medical expert testimony as to the damages allegedly resulting from the battery. Specifically, plaintiffs offered no medical expert testimony which would establish a causal link between the battery and plaintiffs' harm.

The trial court concluded that an expert was necessary to establish both causation and damages, and it entered a directed verdict for this reason.

3. "An operation which is beyond the scope of the patient's informed consent constitutes a separate tort." *Moure v. Raeuchle*, 529 Pa. 394, 401 n. 6, 604 A.2d 1003, 1006 n. 6 (1992). "Surgery performed absent consent or with inadequate consent may give rise in Pennsylvania to malpractice actions, assault and battery actions, or both." 1 *Summ. Pa. Jur.2d* 447.

4. As the trial court points out, the Montgomerys' complaint included a third claim grounded solely upon professional negligence, but it was dismissed prior to trial upon a motion for partial summary judgment, because the court's pre-trial order precluding a liability expert had rendered the claim impossible of proof. The court also expresses puzzlement as to why the informed consent negligence claim was not also the subject of this motion, for it also requires expert testimony.

¶9 The Montgomerys present for our consideration only their medical battery claim, arguing that their choice not to call an expert to prove causation and/or damages should not, as a matter of law, have precluded the jury from considering the evidence they had presented as to both liability and damages for battery.

■ ¶10 The differences between a medical malpractice informed consent case grounded in negligence (commonly referred to as an "informed consent" case) and one based on battery are at the heart of this case and must be kept clearly in mind. Whether John Montgomery granted Dr. Sehgal permission to insert the prosthesis as well as to eliminate the penile blockage is the essence of both a negligence and a battery claim, but for different reasons. In an informed consent claim grounded in negligence, the matter of permission goes to the scope of the contract between physician and patient, and the primary inquiry is whether the injury suffered was within the known risks of which the patient was informed, or whether the information, particularly as to alternative procedures, was complete. *Grabowski v. Quigley*, 454 Pa.Super. 27, 684 A.2d 610, 616 (1996).

■ ¶11 In contrast, in a battery claim such as that at hand, there need be no physical injury, but only some contact; the matter of permission goes to the quality of the contact, and consent to being so touched is a defense. *Chandler v. Cook*, 438 Pa. 447, 265 A.2d 794 (1970). The Restatement (Second) of Torts specifies:

(1) An actor is subject to liability to another for battery if

 (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

 (b) an offensive contact with the person of the other directly or indirectly results.

Restatement (Second) of Torts § 18(1)(a), (b) (1965). We have explained:

Implicit in the tort of battery is the recognition that an individual has a right to be free from unwanted and offensive or harmful intrusions *upon his own body*. The tort of battery has traditionally been employed to redress this precise grievance. The essence of the tort "consists in the offense to the dignity involved in the unpermitted and intentional invasion of the inviolability of [the plaintiff's] person. . . ." Thus, the Restatement recognizes that an intrusion upon the plaintiff's physical or personal dignity does occur where the defendant "throws a substance, such as water, upon the [plaintiff] or if [the defendant] sets a dog upon him" even though the defendant and plaintiff have not physically touched each other.

*Herr v. Booten*, 398 Pa.Super. 166, 580 A.2d 1115, 1117 (1990) (citations omitted) (emphasis in original).

■■ ¶12 Another difference is that while an informed consent negligence claim requires the presentation of expert testimony in order to establish the physician's duty, *Sagala, supra,* a medical battery claim does not:

Unlike an informed consent case where it must be shown that " 'as a result of the recommended treatment, the patient actually suffers an injury the risk of which was undisclosed, or the patient actually suffers an injury that would not have occurred had the patient opted for one of the undisclosed methods of treatment[,]' " [*Maliszewski v. Rendon*, 374 Pa.Super. 109, 542 A.2d 170, 172 (Pa.Super.1988) ] (*quoting Neal by Neal v. Lu*, [ ] [365 Pa.Super. 464] 530 A.2d 103, 111 ( [Pa.Super.] 1987)), it is not necessary for a plaintiff to prove such specific medical findings under a theory of battery. Therefore, while the need for [sic] expert medical testimony is necessary in an informed consent case, it is not where the case involves battery.

*Taylor v. Albert Einstein Medical Center,* 723 A.2d 1027, 1035 (Pa.Super.1998) (quoting *Grabowski, supra,* at 615). *See Reist v. Manwiller,* 231 Pa.Super. 444, 332 A.2d 518, 520–21 (1974) (physician need not testify in order for plaintiff to prove pain and suffering and loss of consortium were caused by automobile accident). *See also Newton v. Porter,* 206 Ga.App. 19, 424 S.E.2d 323, 324 (1992) (no need for patient to file an expert's affidavit when pursuing a battery claim).

■ ¶ 13 Before us is a battery case grounded on the lack of consent to the procedure itself, not a negligence case grounded on the act of inadequately advising the patient of the risks of or alternatives to the procedure (an "informed consent" case). Cases such as *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978) and *Maliszewski v. Rendon,* 374 Pa.Super. 109, 542 A.2d 170 (1988), which consider only negligence-based malpractice claims, are not applicable.

■ ¶ 14 The primary issue in the medical battery claim at trial was whether Dr. Sehgal's implantation of an inflatable pump penile prosthesis into Montgomery's body constituted an unpermitted, intentional contact. *See Grabowski, supra* at 615 (Pa.Super.1996) (the nature and scope of a patient's consent is the dispositive issue in a battery claim). *See also Joiner v. Lee,* 197 Ga.App. 754, 399 S.E.2d 516, 518 (1990) (a cause of action for battery exists when objected-to treatment is performed without the permission of the patient); *Guin v. Sison,* 552 So.2d 60, 61 (La.App.1989) (finding the essence of medical battery is a procedure neither contemplated nor anticipated by the patient). It is irrelevant to such a claim whether the surgery was performed perfectly or imperfectly; in fact, the Montgomerys conceded it was performed well. Even where an operation benefits a patient, however, it may still constitute a battery if permission was not given and there was no emergency. *Chandler, supra* ; *Dunham v. Wright,* 423 F.2d 940 (3d Cir.1970) (citing *Gray v.*

*Grunnagle,* 423 Pa. 144, 223 A.2d 663 (1966)).

■ ¶ 15 The unpermitted touching itself gives rise to a civil battery action. *See Stover v. Surgeons,* 431 Pa.Super. 11, 635 A.2d 1047, 1052 (1993) (where there is no touching there is no technical battery); *Wu v. Spence,* 413 Pa.Super. 352, 605 A.2d 395, 396 (1992) (a technical battery occurs when a physician touches a patient without permission). There is no need to show actual physical injury, but only unpermitted and therefore offensive contact, in order to establish liability for battery. *See Bowman v. Home Life Ins. Co.,* 243 F.2d 331 (3d Cir.1957) (insurance agent making physical examinations of female applicants for insurance).

¶ 16 There is no dispute that Dr. Sehgal implanted an inflatable prosthesis into Montgomery's penis, thereby touching him. There is at least credible evidence that, additionally, he did so without permission. We have previously held that summary judgment is inappropriate where the record contains substantial, credible evidence to support a battery claim based on lack of permission to perform a surgical procedure. *See Taylor, supra* at 1036; *Joiner, supra* at 520 (summary judgment was improperly granted where inconsistencies existed in the testimony regarding permission granted by patient to operating physician). The same would normally hold true of a directed verdict and would require our reversal. However, this case is somewhat more complex.

¶ 17 The trial court essentially agrees with the foregoing, stating in its opinion: "It is clear that there is evidence in this record from which a trier of fact could conclude that Dr. Sehgal perpetrated a battery upon John ..." even without an expert witness. The court, however, did not allow the jury to deliberate upon this primary issue because it found that the Montgomerys' failure to call an expert to testify that their injuries had been caused by the battery precluded the claim. The

dissent, too, acknowledges that the absence of an expert would not necessarily have been fatal to the Montgomerys' battery claim:

> While expert testimony may not have been necessary to establish that a battery occurred, I am convinced that it was necessary for appellants to prove that the battery directly, obviously and foreseeably caused appellants' physical and emotional damages.

¶ 18 Certainly, as with any tort, in order for the Montgomerys to recover damages, they must show that the battery caused the injuries of which they complain. *Grabowski, supra.* At issue is whether an expert was required to prove such causation in this particular case.

¶ 19 The injuries the Montgomerys claim to have suffered are partially in the nature of mental anguish, a form of actual or compensatory damages. Montgomery testified that he felt "more like a machine than a man" after the surprise insertion of the inflatable pump into his scrotum and the prosthesis into his penis, and that the device was cumbersome and humiliating. This, he stated, has had a negative impact upon his emotional and physical state during sexual relations with his wife.

¶ 20 Mental anguish damages may be assessed in appropriate medical battery cases:

> The plaintiff may further recover for all injuries proximately caused by the mere performance of the operation, whether the result of negligence or not. If an operation is properly performed, albeit by a surgeon operating without the consent of the patient, and the patient suffers no injuries except those which foreseeably follow from the operation, then a jury could find that the substitution of surgeons did not cause any compensable injury. Even there, however, a jury could award damages for mental anguish resulting from the belated knowledge that the operation was performed by a doctor to whom the patient had not given consent. Furthermore, because battery connotes an intentional invasion of another's rights, punitive damages may be assessed in an appropriate case.

*Grabowski, supra,* at 615 (quoting *Perna v. Pirozzi,* 92 N.J. 446, 457 A.2d 431 (1983)) (emphasis in original).[5] If this be true when a patient belatedly discovers that the operation he expected was performed by a *different surgeon,* it must also be true when what he discovers upon waking up is that a *different operation* was performed by the expected surgeon. Most people would likely find the second even more emotionally distressing than the first.[6] It is clear that mental anguish damages are available in such a situation.

¶ 21 At the close of the plaintiffs' case, counsel for Dr. Sehgal presented a motion for a compulsory non-suit on the basis that the connection between the battery and the requested damages could not be proved without an expert. During an extensive discussion in chambers between the trial court and counsel, the trial court correctly stated, after reviewing the law:

> Mr. Montgomery's protestations to the presence of the prosthesis do[ ] not require an expert for him to say that it is

---

5. Punitive damages are not appropriate in the case at hand, for they were not requested.

6. Albeit in an informed consent case, our supreme court has stated:

> The most vivid example of this point was illustrated in the case of *Mohr v. Williams,* 95 Minn. 261, 104 N.W. 12 (1905), overruled on other grounds, *Genzel v. Halvorson,* 248 Minn. 527, 80 N.W.2d 854 (1957). In *Mohr,* a surgeon, with the patient's consent, anticipated operating on the patient's right ear. However, while the patient was under anesthesia, the surgeon realized that the right ear could be treated non-surgically but the left ear required non-emergency surgery. The surgeon then proceeded to operate on the left ear. Despite the fact that the operation in the left ear was medically sound, the patient was permitted to prosecute her cause of action because the surgeon proceeded beyond the bounds of his consent.

*Moure, supra* at 405, 604 A.2d at 1008.

cumbersome and he never expected it to be there. I don't think that would require an expert.... [E]xpert medical testimony is necessary to establish the causal nexus of the injury to the tortious conduct in those cases where the connection is not obvious. Clearly, as to the things of which Mr. Pietrandrea [attorney for the Montgomerys] complained, the connection is obvious.

The motion was denied.

¶ 22 At the close of the evidence, the defense moved for a directed verdict on the same basis. The trial court again discussed the issue in an on-the-record chambers conference. First, it examined John Montgomery's claim that he had a reduced or different physical sensation in his penis, was no longer able to feel the physical pleasures of intercourse, and was unable to sustain an erection without inflating the device via the pump. As to this sort of physical injury, the court ruled, an expert would have been required in order to prove that the claimed injuries were caused by the insertion of the prosthesis. The court granted a directed verdict as to those damages.

¶ 23 Second, the court examined the mental anguish and loss of consortium components of the Montgomerys' injuries: that the device was cumbersome, embarrassing, made John feel like a machine, and had a negative emotional impact on the couple's marital relations. Initially, the court denied the directed verdict as to these injuries, finding, as it had before, that the connection between the battery and these injuries was obvious and direct and, thus, that damages could be awarded for them without expert testimony. However, after further discussion, the court decided that any damages based upon these injuries could not be sustained without expert testimony. The court explained that, as to such psychological effects, it could not determine where the dividing line was between medical testimony, which would require an expert witness, and non-

medical testimony, as to which an expert would not be required.

¶ 24 The dividing line is clear in the law, however. As the court had earlier correctly stated, compensatory damages, including mental anguish damages, may be awarded even in the absence of expert testimony, for *direct, obvious, and foreseeable* results of an injury in a non-negligence case, and this is true even when the bodily injury is minor or trivial in character. *Corcoran v. McNeal*, 400 Pa. 14, 23–24, 161 A.2d 367, 373 (1960); *Shiner v. Moriarty*, 706 A.2d 1228, 1239 (Pa.Super.1998); *Long v. Yingling*, 700 A.2d 508 (Pa.Super.1997). *See* 1 *Summ. Pa. Jur.2d* § 9:42. In order for proof of such damages to go forward without an expert, the causal connection must be *obvious, direct, and proximate.* If the connection is such, then no expert is required. If the connection is not obvious, an expert is required:

> Expert testimony is not required "where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even nonprofessional persons." *Chandler v. Cook*, 438 Pa. 447, 451 n. 1, 265 A.2d 794, 796 n. 1 (1970); *see also Brannan v. Lankenau Hosp.*, 490 Pa. 588, 417 A.2d 196 (1980).

*Welsh v. Bulger*, 548 Pa. 504, 513 n. 11, 698 A.2d 581, 585 n. 11 (1997). *See Reist, supra* ("[E]xpert medical testimony is not always necessary to prove damages.").

¶ 25 The distinction earlier drawn by the trial court was correct. In this particular case, any injury involving physical sensation would require the testimony of a medical expert to establish a causal nexus. Such causation is not simple, obvious, and direct, in light of Montgomery's difficulties with premature ejaculation and soft erections prior to the surgery. However, the causal connection between the battery and his psychological injuries is clear and direct, as the trial court had earlier recognized.

¶ 26 It is obvious, and within the range of comprehension of non-professionals, that the surprise and unpermitted insertion of an inflatable pumping prosthesis into Montgomery's scrotum and penis would make him feel embarrassed and machine-like, and that it would have a negative emotional impact upon his marital relations. It is a direct and foreseeable result and is not a complex matter requiring expert testimony. The fact that he might possibly have felt embarrassed by his problems prior to the insertion of the prosthesis is not a factor requiring expert testimony, but is rather a matter to be taken into account by the jury.

 ¶ 27 Our supreme court has stated:

It is the plaintiff's burden to prove that the harm suffered was due to the conduct of the defendant. As in many other areas of the law, that burden must be sustained by a preponderance of the evidence. *Cwiakala v. Paal*, 427 Pa. 322, 235 A.2d 145 (1967); *Zeman v. Canonsburg Borough*, 423 Pa. 450, 223 A.2d 728 (1966); *Amon v. Shemaka*, 419 Pa. 314, 214 A.2d 238 (1965). Whether in a particular case that standard has been met with respect to the element of causation is normally a question of fact for the jury; the question is to be removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue.

*Hamil v. Bashline*, 481 Pa. 256, 265–66, 392 A.2d 1280, 1284–85 (1978). Reasonable minds can and do differ in this case. Therefore, the Montgomerys' medical battery claim should have been presented to the jury. Even in the absence of expert testimony, this case is sufficiently straightforward that the law permits a jury to consider whether the mental distress damages the Montgomerys claim were proximately caused by the medical battery.

¶ 28 Thus, the trial court erred by granting Appellees' motion for a directed verdict and by denying the Montgomerys' motion for a new trial. The case is re-manded to afford the Montgomerys the opportunity to prove their battery claim and related damages without the benefit of an expert witness.

¶ 29 Order reversed. Case remanded for proceedings consistent with this opinion. Jurisdiction relinquished.

¶ 30 POPOVICH, J., files a Dissenting Opinion.

POPOVICH, J., dissenting opinion:

¶ 1 Upon review, I generally agree with the Majority's statement of the applicable law. I also agree with the Majority's conclusion that expert testimony was necessary in this case to establish the causal nexus between the operation performed by Dr. Kuldeep Sehgal and any injury involving physical sensation to John Montgomery's penis and scrotum. However, I respectfully disagree with the Majority's determination that "the causal connection between the battery and [John Montgomery's] psychological injuries is clear and direct...." Rather, I am not convinced that the evidence of causation of appellants' psychological injuries is sufficiently simple, obvious, clear and direct to allow recovery in the absence of expert testimony.

¶ 2 In the present case, I believe that the causal connection between the tortious conduct and appellants' psychological injuries is far from obvious, and it is for this reason that expert testimony was necessary to establish causation. As noted in their brief, appellants' testimony regarding damages centered upon the negative effect the device had upon their relationship and the fact that John Montgomery "felt more like a machine and less like a man" once Dr. Sehgal implanted the device. In addition, John Montgomery testified that because of the implant, he is unable to derive feeling or satisfaction from sexual intercourse and will never be able to achieve an erection without the penile prosthesis or a similar device. Other than their own unsubstantiated averments as to the possible

cause of their psychological injuries, appellants presented no evidence of causation.[7]

¶ 3 The record reveals that John Montgomery suffered from premature ejaculation and the inability to maintain an erection before Dr. Sehgal treated him. Also, prior to the surgery, appellant attempted an alternative course of treatment for his impotence problem. Specifically, he received two injections of Papaverine and Regitine, which were injected directly into his penis. Appellants failed to eliminate John Montgomery's pre-existing impo-

tence or the injections that he received as possible causes of his physical injuries. I agree with the Majority that it is difficult—if not impossible—to determine, based on appellants' testimony, whether their injuries were caused by the implantation of the penile prosthesis, John Montgomery's pre-existing impotence problem or the injections of Papaverine and Regitine. For example, John Montgomery testified that it is now impossible to maintain an erection without the device once it was implanted. Meanwhile, it is evident from the record that John Montgomery could

---

7. Although he continued to have sexual relations with his wife at the onset of his impotence problem, John Montgomery's ability to maintain an erection steadily deteriorated for at least a year and a half before consulting Dr. Sehgal, and as it did, he grew increasingly reluctant to engage in sexual activity. For instance, Marsha Montgomery testified as follows:

Q: ... Now, his problem with premature ejaculation, that was beginning to occur in '88 and into '89, did that affect your sexual relationship with your marriage at all?

A: It was a little bit frustrating but we loved each other and we tried and we did it and we did it but he started to back away a little bit because it was more frustrating to him, you know, he ejaculated so fast.

N.T., 1/12/98, at 82.

Q: How often during this first three month period before surgery would you have your sexual relations?

A: Well like I say, he shied away from me quite a bit sometimes and he was frustrated and we'd start all over again and he couldn't understand why it was releasing. But he did have an idea why, because of the blood clot.

N.T., 1/12/98, at 91.

Q: ... Did ... you or your husband tell Dr. Sehgal at [the initial] visit, that he came in with problems of impotence for the last year and a half, is that accurate?

A: We told him he came in with pre-ejaculation. That he could get an erection but he would ejaculate. If that is called impotency. I didn't consider my husband impotent.

Q: Did your husband tell Dr. Sehgal in the last six months that he had poor erections, was able to penetrate but was getting frustrated about it, is that accurate?

A: Because of the ejaculations, yes.

Q: [Were] there words stated to Dr. Sehgal to the effect that he, meaning your hus-

band, had always had a strong desire in the past but since he is unable to get any decent erection, his desire has also started to go down and he has started to shy away from sexual activity?

A: Part of that statement is correct. It was that he shied away from, started to shy away because of his ejaculation problems.
* * *

Q: Did you report to Dr. Sehgal that this erection problem, by you I mean you and your husband, that this erection problem had come up slowly and has gotten worse, gradually?

A: Yes, it was causing some emotional problems for us.

N.T., 1/12/98, at 135–136.

Similarly, John Montgomery testified:

Q: ... When you started experiencing this premature ejaculation condition, did that affect your sexual relationship with your wife?

A: No, I was getting frustrated because I didn't know what was happening but it didn't stop us from having love sessions on weekends whenever I was home.

N.T., 1/12/98, at 160.

Q: ... It states here your wife is getting frustrated and angry about it, is that an accurate statement?

A: No, I was the one getting frustrated and aggravated because I couldn't keep an erection long enough to get her satisfied.

N.T. at 163–164.

Parenthetically, I note that although appellants testified that the physical and mental injuries allegedly suffered were experienced subsequent to the time the surgery in question was performed, they never testified that such injuries were actually caused by the implant surgery. Further, Dr. Sehgal, the only medical expert to testify, opined that many of the injuries complained of, such as the decreased pleasure John Montgomery felt upon ejaculation, could not have been caused by the implantation of the prosthesis.

not maintain an erection before the prosthetic device was implanted.

¶ 4 However, unlike the Majority, I am unable to conclude from the record whether the mental distress appellants complain of was the direct, obvious and foreseeable result of the implantation of the prosthesis or the continuation of the emotional distress caused by John Montgomery's preexisting impotence problem. While expert testimony may not have been necessary to establish that a battery occurred, I am convinced that it was necessary for appellants to prove by that the battery directly, obviously and foreseeably caused appellants' physical and emotional damages. *See Maliszewski v. Rendon*, 374 Pa.Super. 109, 542 A.2d 170, 172 (1988), appeal denied, 520 Pa. 617, 554 A.2d 510 (1989); *cf., Kazatsky v. King David Memorial Park*, 515 Pa. 183, 527 A.2d 988 (1987); *Corcoran v. McNeal*, 400 Pa. 14, 23–25, 161 A.2d 367, 373 (1960); *Long v. Yingling*, 700 A.2d 508, 516 (Pa.Super.1997).

¶ 5 I do not believe that appellants' testimony regarding their mental anguish met the quantum of proof necessary to survive Dr. Sehgal's motion for a directed verdict because it failed to demonstrate that their mental anguish was a direct and necessary consequence of the allegedly unauthorized surgery. Accordingly, I would affirm the judgment of the trial court.