Margaret TAYLOR and Lewis T. Mapp, Parents and Natural Guardians of the Estate of Ka–rin Alise Taylor, a Minor.

v.

ALBERT EINSTEIN MEDICAL CENTER, Peter Trinkaus, M.D., John Wertheimer, M.D., Owen Williamson, M.D.

Appeal of Albert Einstein Medical Center, Peter Trinkaus, M.D., and John Wertheimer, M.D.

Margaret Taylor and Lewis T. Mapp, Parents and Natural Guardians of the Estate of Ka–rin Alise Taylor, a Minor, Appellants,

v.

Albert Einstein Medical Center, Peter Trinkaus, M.D., Owen Williamson, M.D. and John Wertheimer, M.D., Appellees.

Superior Court of Pennsylvania.

Argued Oct. 21, 1997.

Filed Dec. 18, 1998.

Reargument Denied Feb. 19, 1999.

Frank M. McClellan and Andrew K. Worek, Philadelphia, for appellants (at 3787) and appellees (at 3938).

Before McEWEN, President Judge, CERCONE, President Judge Emeritus, and BECK, J.

McEWEN, President Judge:

These cross-appeals have been taken from the judgment in the amount of $674,565.07 entered November 6, 1996, on the verdict of the jury in favor of Margaret Taylor, the mother of Ka–Rin Taylor, and against Peter Trinkaus, M.D.[1] in this medical malpractice wrongful death and survival action arising from the tragic death of Ka–Rin.

The appeal at No. 3787 PHL 1996 has been taken by the defendants, Albert Einstein Medical Center (hereinafter "Einstein"), Peter Trinkaus, M.D. and John Wertheimer, M.D., seeking judgment n.o.v. or, in the alternative, a new trial, on the following grounds:

> The trial court erred by instructing the jury on "outrageous" conduct causing emotional distress which was legally inconsistent with its entry of directed verdicts in favor of defendants on the issues of informed consent, misrepresentation and punitive damages.

> The trial court erred by instructing the jury on "outrageous" conduct causing emotional distress which the court itself described as "punitive" which was legally inconsistent with the directed verdict on the issue of punitive damages.

> The trial court erred and acted contrary to law in creating a duty between a surgeon and the family members of the patient beyond obtaining informed consent.

> The trial court erred by not making a threshold determination as to whether the complained of conduct was capable of being considered "outrageous" as required by law.

> The trial court erred in not granting judgment non obstante veredicto.

> The trial court erred in failing to issue a remittitur to the clearly excessive jury verdict.

---

1. Owen Williamson, M.D. was dismissed as a party to this action prior to trial, and the jury returned a verdict on the claim for intentional infliction of emotional distress solely against Peter Trinkaus, M.D.

The jury verdict should be set aside and judgment entered in favor of defendants, rather than ordering a new trial.

Margaret Taylor, the appellant in the cross-appeal at No. 3938 PHL 1996, contends that she is entitled to a new trial based on the following rulings by the judge *pro tem* :

The court erred in granting defendants' motion for a directed verdict on plaintiffs' punitive damages claim.

The court erred in directing a verdict for defendants on plaintiffs' counts based on informed consent and misrepresentation where the directed verdicts on the informed consent and misrepresentation claims were based on the court's reading of *Chandler v. Cook*, 438 Pa. 447, 265 A.2d 794 (1970).

The court erred in ruling that plaintiffs were bound by the testimony of Dr. Trinkaus called as of cross-examination during plaintiffs' case in chief.

Ka–Rin Taylor, a 16–year old student at Cardinal Dougherty High School, contracted what was diagnosed by her family physician, Dr. Williamson, on May 30, 1989, as a viral infection. Ka–Rin's illness appeared to worsen and her parents brought her to the emergency room of Einstein Hospital at approximately 3:30 a.m. on June 1, 1989, suffering from shortness of breath and fever. Ka–Rin was initially diagnosed as suffering from Adult Respiratory Distress Syndrome and was admitted approximately six hours later, at 9:30 a.m., to the Pediatric Intensive Care Unit at Einstein with a tentative diagnosis of pneumonia. Ka–Rin's condition began to deteriorate, and at approximately 10:00 a.m.

she was intubated and placed on a ventilator.[2] A chest x-ray taken at 11:00 a.m. revealed that the endotracheal tube had been misplaced into Ka–Rin's right main stem bronchus. The medical records generated by the appellees did not indicate when the x-ray was read or when the tube was repositioned, however, a chest x-ray taken at approximately 1:30 p.m. revealed that the tube had been properly repositioned. Ms. Taylor contended at trial, and offered expert testimony[3] to establish, that the malpositioned tube had not been corrected for at least one, and possibly as long as three hours, and had been a substantial contributing cause of the death of Ka–Rin.

Dr. Peter Trinkaus, the physician in charge of Ka–Rin's care and treatment at Einstein, was called, as of cross-examination, as the first witness for the plaintiffs. Dr. Trinkaus testified that, while he did not have any independent recollection that the endotracheal tube was repositioned, and contended that, while there were no notations of any kind regarding the mispositioning or the repositioning of the tube, based upon the usual practice in the PICU, and the arterial blood gas test data, the tube had been repositioned by 11:15 a.m.[4]

Dr. Trinkaus subsequently determined, later in the day of June 1, 1989, that to properly treat Ka–Rin, he needed the data obtainable only via an invasive diagnostic procedure known as a Swan–Ganz catheterization. Dr. Trinkaus consulted a cardiologist, Dr. John Wertheimer, who concurred in the decision to utilize a Swan–Ganz catheter. Dr. Trinkaus then sought to obtain

---

**2.** This process involves the placement of tubes through the nostrils and into the bronchial region of the lungs. The tubes are then attached to a respirator, and the patient's oxygen levels are manipulated by adjusting the respirator.

**3.** Gerald Galst, M.D., a cardiologist, and Michael Golding, M.D., a thoracic surgeon, both testified that the misplaced endotracheal tube substantially contributed to the death of Ka–Rin.

**4.** The judge *pro tem* ruled, at the close of the evidence, that the plaintiffs were bound by the testimony of Dr. Trinkaus that Ka–Rin's endotracheal tube had been repositioned by 11:15 a.m. This was error. *Gorfti v. Montgomery*, 384 Pa.Super. 256, 558 A.2d 109 (1989), *allo. denied,*

524 Pa. 608, 569 A.2d 1367 (1989). *See: Kelly v. Oxgrove Development Corp.*, 456 Pa. 306, 319 A.2d 424, 425 (1974); *Piwoz v. Iannacone*, 406 Pa. 588, 178 A.2d 707 (1962); *Stack v. Wapner*, 244 Pa.Super. 278, 368 A.2d 292 (1976); *Michultka v. Grapin*, 235 Pa.Super. 51, 340 A.2d 576 (1975). "In Pennsylvania, a party calling a witness as of cross is bound by the testimony thus evoked unless it is contradicted by other evidence, **not limited to direct testimony**, or is inherently incredible." *Gorfti v. Montgomery, supra* 558 A.2d at 111. Ms. Taylor offered substantial evidence to contradict Dr. Trinkaus's belief that the tube had been quickly repositioned and thus she was **not** bound by Dr. Trinkaus's opinion on the issue. *See also:* 42 Pa.C.S. § 5935.

authorization for the procedure from the parents of Ka–Rin. The evidence presented by the parties regarding the consent process is tellingly divergent.

Margaret Taylor, Ka–Rin's mother, testified that she extended her consent to perform the procedure only to Dr. Wertheimer, based on his experience and Dr. Trinkaus's admitted lack of experience:

A. Okay. When Ka–Rin went to the ICU, we were introduced to Dr. Trinkaus, who said that he was the head of pediatrics intensive care, and that he would be working with Ka–Rin, or working on Ka–Rin.

The intensive care unit closes down for an hour during the day, afternoon hours. We had been there in the hospital since, I would say, 3:30 a.m., and at this point it had gotten to be 11:00, maybe 11 o'clock, 11:30, and they were preparing Ka–Rin, they had moved her from the emergency room up to the ICU, and they were preparing the room and getting her ready.

I decided, since we couldn't see her for an hour, I would run home, shower and come back.

I did that, may have taken me 25, maybe 25 to 30 minutes, possible. By car, I'm maybe 3 minutes from the hospital.

I returned to the hospital. At that point, there were additional tubings in Ka–Rin. Dr. Trinkaus allowed us to see her after they opened the ICU, and then he explained to us that she would need to have a Swan–Ganz catheter.

At that point, he said that the procedure was needed because they needed to measure the amount of fluid that was in her lungs. What he actually said to me was, at this point we're practicing 18 $^{th}$ century medication.

I said, what's that? He said, we're giving her oxygen as she needs it, and her pressure – whenever her pressure drops, we're giving her oxygen as she needs it. If we find out how much fluid is in her lungs, we can regulate the oxygen; and the Swan–Ganz catheter would allow us to find out the amount of fluid in her lungs.

We asked things like – her father asked what was the risk factor. My mother

asked who was going to do the procedure. He at that point said that Dr. Wertheimer would be the person doing the procedure.

I said to him, bring him in, he is the person I need to talk to, the cardiologist.

He brought Dr. Wertheimer in. Dr. Wertheimer introduced himself and explained to us that he does this procedure every day on adults, even though Ka–Rin was a child, she had an adult-size body. It was a minor procedure, they could do it within her room. It would be a local anesthetic.

Again asked what the risk factor was, he said a 1% risk factor. We don't even have to take her to the operating room.

Q. Did Dr. Wertheimer say who would do the procedure?

A. He let us know at that point, in explaining that he did the procedure every day, he did it on adults, even though Ka–Rin was a child, he explained to us that he was going to do the procedure. This is what I was told from the very onset, that he was going to do the procedure.

Q. And did Dr. Trinkaus ever give you any information as to who would do the procedure?

A. When my mother asked him, are you going to do the procedure, he said no, a cardiologist, and I asked him at that point, well, bring him in, this is the person I need to talk to; and he brought in Dr. Wertheimer.

A. And Miss Taylor, when did you learn that Dr. Trinkaus had done the procedure?

\*　　\*　\*　　\*　　\*　　\*

What he said to me was that during the procedure, she went into arrhythmia. I wanted to know what that was. He said, well, that's when your heart doesn't have a regular beat, it's a fibrillation, it flutters; and I was asking Ka–Rin's father, I said, do you think she was in any pain.

This is when Dr. Trinkhaus says to me, no, she wasn't. I said, how would you know. How you know if my child was in pain? He said because I did the procedure.

I said you did it? And he said, yes. I said, well, I thought you told me Wertheimer was going to do it.

Now, I don't even remember if I remembered his name. I said, I thought you told me the cardiologist was going to do it. He said it was just like he was doing it, he was standing behind me.

Christina Taylor, Ka–Rin's grandmother, testified that she was also present at the hospital when Dr. Trinkaus explained the procedure to Ka–Rin's parents, and that when Dr. Trinkaus was specifically asked by Ka–Rin's father who would perform the catheterization, Dr. Trinkaus unequivocally stated that Dr. Wertheimer would perform the catheterization.[5] Mrs. Taylor testified that Dr. Trinkaus then brought Dr. Wertheimer into the room to speak with Ka–Rin's parents:

and he came up and he talked with them, and after he assured Lou and Margaret that it wasn't dangerous, that he had did it many times before, and it would take about 30 or 45 minutes, so we was asked to wait in the waiting room, and it was on the same floor that Ka–Rin was on, only she was in a small room. . . .

Tragically, as Mrs. Taylor recounted, while waiting for Dr. Wertheimer to complete the catheterization:

Lou said, Miss Taylor, it is been a long time, it's been longer than they said. So I said yeah, wonder what's going on. So he said I don't know. By this time, lady came up, she was a social worker, I think, and she said to me, she said, are you Miss Taylor? I said yes, I am. Why? She said, who is your minister and what church do you go to? . . . . So we went down, Lou had ran out, then I went down, and they said we couldn't go in there, in the room where Ka–Rin was right there.

So Margaret said, I am going and see my daughter! So Margaret went in there, and there was blood on the wall, and there was blood on the floor, and Ka–Rin had blood on her face, . . . .

Robert Westle, a social worker employed by the defendant Einstein Hospital, conceded on cross-examination that Dr. Trinkaus had admitted to Ka–Rin's parents that he had

very little experience with Swan–Ganz catheters. Mr. Westle testified as follows:

Q. We don't have a form to evidence the communication [written consent] between them, correct?

A. Correct.

Q. Because they [Ka–Rin's parents] weren't aware of this form; correct?

A. I don't know if they were aware of it or not.

Q. But you certainly didn't show it to them?

A. No, I did not.

Q. So now the jury needs to know what was the content of the conversation that you overheard take place between Dr. Wertheimer and Dr. Trinkaus and the family.

I would like to ask you, sir, did you at any point in time hear Dr. Trinkhaus say, I am not experienced in this procedure?

A. I recall a discussion that—I don't know if those were his exact words, but that he hadn't done a lot of the procedures.

Q. And did you hear the family say, who will do the procedure?

A. No, I did not.

Q. What prompted Dr. Trinkaus to go get Dr. Wertheimer?

A. By my memory, that the family still was undecided and wanted to hear more information on what her condition was, and why this procedure was necessary.

Q. Would it be a fair statement they declined to consent to Dr. Trinkaus to do the procedure at that point?

A. That was not my perception or understanding at that time.

Q. What was your perception at that time?

A. That they just—there's a difference between declining consent and refusing something, and just not having made the decision to give consent yet.

And they were still formulating an opinion on whether or not they wanted to authorize consent.

---

5. Ka–Rin's father, Lewis Mapp, and her aunt, Robena Taylor, also testified that Dr. Trinkaus had stated that Dr. Wertheimer would perform the catheterization.

Q. And did you hear the conversation after Dr. Wertheimer came down to speak with them?

A. After he spoke with them or during—

Q. During the conversation?

A. Yes.

Q. Did you at any time during that conversation hear Dr. Wertheimer say who would do the Swan–Ganz catheter procedure?

A. Did I hear Dr. Wertheimer say who would do it?

Q. Who would do it?

A. **Not that I recall.** (emphasis added)

Q. Did you hear any discussion about who would do it?

A. The discussion that I recall was that Drs. Trinkaus and Wertheimer were going to be involved in doing a Swan–Ganz procedure.

Q. Did you hear Dr. Wertheimer tell the family that he had done it many times?

A. That's correct.

Q. Did you hear Dr. Wertheimer tell them that the risks were minimal?

A. He went through various risks that were involved, and I think he did state that the risks were small, and that, you know, that the risks were small, I would say. I don't know if I would say minimal.

Q. Is it customary in Einstein Hospital to have a procedure done that's invasive without a written consent if the parents of a minor are available to sign a written consent form?

A. I wouldn't say it's customary. They certainly obtain consent. If it's emergent, it can happen, you know, with a verbal consent, but it's not customary.

Q. Can you tell the jury any reason why Dr. Trinkaus did not get a written consent for him to do the procedure?

A. Only that I know, as I said, when we concluded the meeting, they left the room in a hurry to go back into Ka–Rin's room, and I mean, I can't speak for his frame of mind at that point in time, but I know that they were very focused on—they were very concerned that she might die, and they needed to start this procedure.

Q. And you left the hospital at that point?

A. Shortly thereafter. Around the time they may have been getting set up or started, I wasn't sure because I wasn't looking into the isolation room.

Q. Did you ask the family if they had any questions about what was going to happen?

A. Not before I left the hospital. Whatever questions they may have had, they expressed during whatever meetings that we had, and after they authorized consent, there were no further conversations between myself and the family.

Q. Did you go to the PICU?

A. After the meeting? Yes.

Q. And what did you do there?

A. I followed Drs. Trinkaus and Wertheimer into the nurse's station. At that—it was in there that I—well, one, I authorized—I witnessed, put my signature down as a witness to the consent, and I don't recall specifically what else I did. I am sure I spoke to some of the staff in there about the fact that we had had a meeting.

Q. Did you tell anyone at that point in time that the family had not signed the consent form?

A. Not that I recall.

Q. Did you ask Drs. Trinkaus and Wertheimer, did they want someone to get their signature on the form?

A. No, I did not.

Q. Why not?

A. Because, again, it's not my role to obtain consent, and even if I had asked them, they would have gone out, themselves, to get it; and they were aware of the fact that the form hadn't been signed **because the form was prepared by Dr. Trinkaus, who asked me if I could just put down the fact that I had witnessed the consent.** (emphasis added)

Plaintiffs sought to establish at trial that Dr. Trinkaus was desirous of obtaining experience performing such procedures and, despite having assured the plaintiffs that Dr. Wertheimer would perform the procedure, knowingly undertook to perform the insertion of the catheter and sheath while Dr.

Wertheimer stood near by and read the waveforms produced by the catheter.

Dr. Trinkaus testified on direct that Swan–Ganz catheterization is not a frequent procedure in the pediatric ICU [6], and that he had performed less than six Swan–Ganz catheterizations including subclavian, femoral or jugular "in all aged children, through adult." Dr. Trinkhaus, however, specifically and repeatedly denied that he had told the plaintiffs that Dr. Wertheimer would perform the catheterization [7]:

... Doctor, did you tell Miss Taylor or Mr. Mapp that Dr. Wertheimer would insert the sheath?

A. No, I did not.

Q. Are you certain of that?

A. I am absolutely certain of that.

Q. And how do you know that, Doctor?

A. **Because I remember very clearly indicating to them that I would do the sheath.** [emphasis supplied]

Q. Had they told you they wanted Dr. Wertheimer to do the sheath, would you have done it?

A. No.

Q. Now, after Dr. Wertheimer came down and the consent was obtained, what was your understanding of Dr. Wertheimer's role in the procedure? What was he to do?

A. He was to be present to supervise the passage of the Swan catheter through the introducer sheath, and then through the heart into the pulmonary circuit to help me and the resident with me interpret the waveforms and pressures.

Q. Did you at any time mention to Miss Taylor or Mr. Mapp that you would consult a cardiologist?

A. Yes, I did.

Q. And did you give them a reason for that?

A. Yes. I told them I had limited experience in passing a Swan, and, therefore, I needed to consult a cardiologist, call in a cardiologist, something along that line.

\* \* \* \* \* \*

Q. Dr. Trinkaus, you are charged in this case by the plaintiffs with lying to or misleading Miss Taylor and Mr. Mapp about who was going to do what parts of that procedure. How do you answer that charge?

A. They are mistaken. I mean, I have no recollection of any specific interaction, either they telling me, or me telling them, that Dr. Wertheimer was to do any part of the procedure.

I have a very specific recollection that I told them very clearly in no uncertain terms that I was putting in the sheath with the resident, but that essentially, that I was putting in the sheath, and all I told them about the cardiologist was I was calling in a cardiologist, I was consulting a cardiologist because I had limited experience with this.

We never had an exchange where it was specifically discussed who was doing what part of the procedure, except for the sheath, that I was going to do the sheath without the cardiologist present, call the cardiologist.

If there had been that conversation, the cardiologist would have done it, period.

Q. Doctor, Dr. Galst and Dr. Golding came in front of this jury and testified that you, Peter Trinkhaus, had no business whatsoever putting in the sheath in that young lady because you weren't experienced enough. How do you answer that charge?

A. I believe I was experienced enough to do that.

Dr. Trinkaus conceded on cross-examination that he asked Dr. Wertheimer to participate in the procedure solely because of his limited experience with the Swan–Ganz catheterization procedure and, in response to the inqui-

---

**6.** Dr. Trinkaus's testimony was that "in general it tends to be not very commonly used, certainly not like in internal medicine."

**7.** The jury's verdict in favor of Ms. Taylor on the claim for intentional infliction of emotional harm

represents a credibility determination in favor of Ms. Taylor, Mr. Mapp, Ms. Christine Taylor, and Ms. Robena Taylor, and against Dr. Trinkaus on the consent issue which is binding on this Court.

ry as to whether there was any conversation "about who would do the procedure?", replied that "I have no recollection of a discussion during that time, other than to say, we, as a team, were going to do the procedure."

The parties agree that Ka–Rin died during the procedure, at approximately 6:25 p.m., while the defendants contend that her death was wholly unrelated to the catheterization procedure.[8] Plaintiffs presented the expert testimony of Gerald Galst, M.D., a board-certified cardiologist who testified that it was his expert opinion that "the inadvertent placement of the catheter in an arterial vessel and an attempt to pass it was a direct initiating factor in the events that occurred, namely, her cardiac arrest and subsequent death." Plaintiffs also offered the expert testimony of Michael R. Golding, M.D., a board-certified thoracic surgeon, who testified that "the improperly placed Swan–Ganz catheter triggered an arrhythmia."

The judge *pro tem*, purportedly relying upon the decision of the Supreme Court in *Chandler v. Cook*, 438 Pa. 447, 265 A.2d 794 (1970), granted the motion of the defendants for a directed verdict on the informed consent claim at the close of the evidence, ruling that the **identity** of the surgeon who was to perform the procedure was irrelevant to the issue of informed consent. The judge *pro tem* also granted a directed verdict as to the misrepresentation and negligent infliction of emotional distress claims, and removed the issue of punitive damages from the consideration of the jury.

The jury, in response to special interrogatories, found that Dr. Trinkaus had been negligent, but that his negligence had not been a substantial factor in causing the death of Ka–Rin Taylor.[9] The jury also found that the conduct of Dr. Trinkaus had been outrageous and had been a substantial factor in causing the emotional distress of Margaret Taylor, for which the jury awarded $500,000 in compensatory damages. Following the denial of post-trial motions, these appeals were timely filed.

## I. *Appeal at No. 03938 Philadelphia 1996*

### A. *LACK OF CONSENT*

 Margaret Taylor, who offered evidence to establish that consent was provided only to Dr. Wertheimer to perform the procedure and not to Dr. Trinkaus,[10] contends that she is entitled to a new trial as a result of the refusal of the judge *pro tem* to submit the issue of lack of consent to the jury, based upon his reading of *Chandler v. Cook, supra*. As we agree with Ms. Taylor that Pennsylvania law permits a patient to specifically limit his or her consent to an invasive procedure to a particular surgeon, we are constrained to vacate the judgment and remand for a new trial.

> Since the agreement between the physician and his patient is contractual in nature, for there to be a valid consent it must be clear that both parties understand the nature of the undertaking and what the possible as well as expected results might be. It will be no defense for a surgeon to prove that the patient had given his consent, if the consent was not given with a true understanding of the nature of the operation to be performed, the seriousness of it, the organs of the body involved, the disease or incapacity sought to be cured, and the possible results. .... A physician or surgeon need not disclose all known information; however, the physician or

---

8. Dr. Wertheimer, while reading the waveforms, advised Dr. Trinkaus that he had accidentally entered an arterial vessel, resulting in arterial waveforms on the monitor. At trial, evidence was offered by the defense in an attempt to establish that Dr. Wertheimer had incorrectly interpreted the waveforms so as to establish that Dr. Trinkaus had not entered an artery. While the parties agreed that such an event is a recognized risk of the procedure, Dr. Trinkaus contended at trial that he and Dr. Wertheimer had erred in their earlier conclusions that Dr. Trinkaus had entered an artery.

9. The jury found that Dr. Wertheimer had not been negligent and that his conduct had not been outrageous.

10. As previously noted, Ms. Taylor offered substantial evidentiary support for this contention via the testimony of Margaret Taylor, Lewis Mapp, Christina Taylor, Robena Taylor, and Robert Westle.

surgeon is required to advise the patient of those material facts, risks, complications and alternatives to surgery that a reasonable person would consider significant in deciding whether to have the operation.

Gouse v. Cassel, 532 Pa. 197, 202–203, 615 A.2d 331, 333–334 (1992) (citations, quotation marks and emphasis omitted).

\* \* \* \* \* \*

However, a plaintiff need not prove that a causal relationship exists between the physician's or surgeon's failure to disclose information and the patient's consent to undergo surgery. Gouse, 532 Pa. at 202, 615 A.2d at 333. This Court has also recognized that a plaintiff need not prove by expert testimony that the surgery caused an injury. Rowinsky v. Sperling, 452 Pa.Super. 215, 681 A.2d 785, 790 (Pa.Super.1996), appeal denied, 547 Pa. 738, 690 A.2d 237 (1997). Recovery on the theory of informed consent is permitted regardless of causation because it is the conduct of the unauthorized procedure that constitutes the tort. Moure, 529 Pa. at 405, 604 A.2d at 1008.

Boutte v. Seitchik, 719 A.2d 319, 323 (1998).

This Court, through the insightful opinion of our learned colleague Judge Joseph A. Hudock, announced on October 18, 1996, in Grabowski v. Quigley, 454 Pa.Super. 27, 684 A.2d 610 (1996), allo. granted, 548 Pa. 670, 698 A.2d 594 (1997), appeal dismissed as improvidently granted, 553 Pa. 75, 717 A.2d 1024 (1998), reversed the entry of summary judgment in favor of the defendant physicians where the plaintiff alleged that he had "consented to an operation to be performed in its entirety by Quigley, not by Bailes, or a combination of Bailes and Quigley." Id. 684 A.2d at 614. The Grabowski court noted:

Over thirty years ago our Supreme Court stated that "where a patient is mentally and physically able to consult about his condition, in the absence of an emergency, the consent of the patient is 'a prerequisite to a surgical operation by his physician' and an operation without the patient's consent is a technical assault." Smith v. Yohe, 412 Pa. 94, 106, 194 A.2d 167, 174 (1963) (citations omitted). Accord Moure

v. Raeuchle, 529 Pa. 394, 404, 604 A.2d 1003, 1008 (1992); Stover v. Association of Thoracic and Cardiovascular Surgeons, 431 Pa.Super. 11, 17, 635 A.2d 1047, 1050 (1993).

Since Appellant has alleged facts which, if true, established that consent was not given to Bailes and/or Quigley to perform the surgery in the manner in which it occurred, he has thereby alleged sufficient facts to establish a cause of action for battery against them.

\* \* \* \* \* \*

Here, because the theory of recovery is battery, Appellant need not establish that the surgery was performed in a negligent manner. In other words: "said surgery could have been done perfectly, and could even have had a beneficial effect on the patient, yet a cause of action could still exist; for it is the very conduct of the unauthorized procedure which constitutes the tort." Moure, 604 A.2d at 1008 (referring to informed consent action).

Nevertheless, it is axiomatic that in any tort action the plaintiff must prove that the injury for which recovery is sought was caused by the tortious act in question. Maliszewski, 542 A.2d at 172. Unlike an informed consent case where it must be shown that " 'as a result of the recommended treatment, the patient actually suffers an injury the risk of which was undisclosed, or the patient actually suffers an injury that would not have occurred had the patient opted for one of the undisclosed methods of treatment[,]' " id. (quoting Neal by Neal v. Lu, 365 Pa.Super. 464, 478, 530 A.2d 103, 111 (1987)), it is not necessary for a plaintiff to prove such specific medical findings under a theory of battery. Therefore, while the need for expert medical testimony is necessary in an informed consent case, it is not where the case involves battery. See Tom v. Lenox Hill Hospital, 627 N.Y.S.2d 874, 876, 165 Misc.2d 313, 316 (1995) (recognizing battery claim under similar facts and providing that claim "does not require expert medical testimony as would normally be true with an informed consent claim").

Where it is proven that an unauthorized invasion of a person's personal integrity has occurred, **even if harmless**, the person is entitled to nominal damages. Prosser and Keeton, *Law of Torts* § 9 at p. 40 (5 th ed.1984). In *Perna v. Pirozzi*, 92 N.J. 446, 457 A.2d 431, (1983), the New Jersey Supreme Court further explained:

> The plaintiff may further recover for all injuries proximately caused by the mere performance of the operation, whether the result of negligence or not. If an operation is properly performed, albeit by a surgeon operating without the consent of the patient and the patient suffers no injuries except those which foreseeably follow from the operation, then a jury could find that the substitution of surgeons did not cause any compensable injury. Even there, however, a jury could award damages **for mental anguish resulting from the belated knowledge that the operation was performed by a doctor to whom the patient had not given consent.** Furthermore, because battery connotes an intentional invasion of another's rights, **punitive damages may be assessed in an appropriate case.**

*Grabowski v. Quigley, supra,* 684 A.2d at 615 (emphasis supplied), quoting *Perna v. Pirozzi, supra,* 92 N.J. at 459–61, 457 A.2d at 438 (emphasis supplied).

Margaret Taylor alleged that she had granted consent to perform the invasive procedure **only** to Dr. Wertheimer, based upon his representation that he had performed the catheterization procedure hundreds of times. In *Grabowski,* where the plaintiff contended that "his consent extended to an operation to be performed **by Quigley only,**" this Court found that a patient has the right to limit his or her consent to a surgical procedure to a specific physician:

> ... a basic tenet of the contract, if it is to be a contract at all, is that the physician with whom the patient has contracted is obligated to perform the services. In this regard, the *Perna* court quoted from the Judicial Council of the American Medical Association, Op. 8.12 (1982):

> > The patient is entitled to choose his own physician and he should be permitted to acquiesce in or refuse to accept the substitution.... The patient is entitled to the services of the particular surgeon with whom he or she contracts. The surgeon, in accepting the patient is obligated to utilize his personal talents in the performance of the operation to the extent required by the agreement creating the physician-patient relationship. He cannot properly delegate to another the duties which he is required to perform personally.... If the surgeon employed merely assists the resident or other physician in performing the operation, it is the resident or other physician who becomes the operating surgeon. If the patient is not informed as to the identity of the operating surgeon, the situation is "ghost surgery".

*Grabowski v. Quigley, supra,* 684 A.2d at 617 quoting *Perna, supra.*

As the record contains substantial credible evidence to support the battery claim based upon the lack of consent for Dr. Trinkaus to perform the procedure, the case must be remanded for a new trial. For the same reasons, the claim for misrepresentation should not have been removed from the consideration of the jury.

While our award of a new trial renders moot the remaining issues urged upon us by the parties, we will address certain of those arguments which will necessarily arise upon retrial.

## B. *PUNITIVE DAMAGES*

 The allegations made by Margaret Taylor regarding the conduct of Dr. Trinkaus in connection with the consent to perform the Swan–Ganz catheterization, conduct which Dr. Trinkaus specifically denied at trial, represented the type of conduct which, if found by the jury to be true, certainly warranted the imposition of punitive damages. *See, e.g.: Grabowski v. Quigley, supra.* The judge *pro tem* refused to allow the issue of punitive damages to be submitted to the jury based on his belief that "It's a practical matter that that charge [intentional infliction of emotional distress] is basically a punitive

damage charge, in the way I read it. I think it would double punitive damages." Contrary to the arguments of the appellants and the reasoning of the judge *pro tem,* the damages which the jury was instructed to award if it found that Ms. Taylor had established that Dr. Trinkaus had intentionally inflicted emotional distress upon her, were compensatory damages and **not** punitive damages. The relevant portion of the instructions given to the jury provided:

"There's also a claim for outrageous conduct causing severe emotional distress to Margaret Taylor. A person who by extreme and outrageous conduct recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for any bodily harm to the other which results from the emotional distress. When defendant's conduct is directed to a person other than the one who suffers the emotional distress, the defendant is still liable if his conduct was a substantial factor in causing the emotional distress.

"Extreme and outrageous conduct is that which goes beyond all possible bounds of decency and is such as would be regarded as atrocious and utterly intolerable in a civilized community.

"Emotional distress included all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment and worry such as that no reasonable person could be expected to endure it.

"In determining whether the emotional distress suffered by the plaintiff was severe, you may consider both the intensity of the distress and its duration. In this regard, there is a claim that Ms. Taylor suffered emotional distress. You have to separate in your mind, if you can, what emotional distress you believe she would have sustained from the mere death of her daughter that would have occurred absent of negligence on the part of the doctor, [i.e.] grieving time, versus the emotional distress that you feel she may have suffered by the conduct, the alleged conduct of the defendants regarding who was to do a Swan–Ganz procedure.

"It's for you to determine whether there is such evidence in the case by a witness that talked about her emotional distress. And you heard the testimony, I believe, of only one witness in this case in that regard; that lady who was a psychologist and was giving Ms. Taylor counseling sessions ... And the former employer, the gentleman from the Youth Studies Center. If you find that the defendant is liable to the plaintiff, Margaret Taylor, you must then find an amount of money damages which you believe will fairly compensate the plaintiff for all the physical and financial injury she has sustained as a result of this claim for severe emotional distress."

Unlike compensatory damages, punitive damages are not intended to "fairly compensate the plaintiff" but rather are intended " 'to deter and punish egregious behavior' .... Punitive damages are not awarded as additional compensation but are purely penal in nature." *G.J.D. v. Johnson,* 552 Pa. 169, 713 A.2d 1127, 1129 (1998), quoting *Martin v. Johns–Manville Corp.,* 508 Pa. 154, 169, 494 A.2d 1088, 1096 (1985). *Accord: Shiner v. Moriarty,* 706 A.2d 1228, 1241 (Pa.Super.1998). Punitive damages may be awarded where the defendant's conduct evidences a "reckless indifference to the rights of others." *Feld v. Merriam,* 506 Pa. 383, 395, 485 A.2d 742, 748 (1984). *Accord: Martin v. Johns–Manville Corp., supra* at 170–173, 494 A.2d at 1097–1098; *Ruffing v. 84 Lumber Co.,* 410 Pa.Super. 459, 600 A.2d 545 (1991), *allo. denied,* 530 Pa. 666, 610 A.2d 46 (1992); Restatement (Second) of Torts, § 908(2). "Reckless disregard" is further defined by Section 500 of the Restatement (Second) of Torts, which provides:

the actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

The course of conduct which Margaret Taylor contended Dr. Trinkaus engaged in, once the jury accepted her testimony as true, is precisely the type of conduct which punitive damages are intended to prevent and for which punitive damages may be recovered. Thus, upon retrial, the court is directed to instruct the jury on the issue of punitive as well as compensatory damages.

## II. *Appeal at No. 03787 Philadelphia 1996*

### A. JUDGMENT N.O.V. ON INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

 Dr. Trinkaus initially argues that the trial court erred when it refused to enter judgment n.o.v. in his favor on the verdict in favor of Ms. Taylor based on intentional infliction of emotional distress. We disagree.

The requirements of the tort of intentional infliction of emotional distress are set forth in Section 46 of the Restatement (Second) of Torts.

The status of this cause of action is unclear in Pennsylvania as some appellate courts have adopted Restatement § 46, but our supreme court has not. *See, Johnson v. Caparelli*, 425 Pa.Super. 404, 625 A.2d 668 (1993). However, our supreme court has acknowledged Restatement § 46. *Kazatsky v. King David Memorial Park*, 515 Pa. 183, 527 A.2d 988 (1987).

*Fewell v. Besner*, 444 Pa.Super. 559, 664 A.2d 577, 581 (1995). *Accord: Hunger v. Grand Central Sanitation*, 447 Pa.Super. 575, 670 A.2d 173, 177 (1996), *allo. denied*, 545 Pa. 664, 681 A.2d 178 (1996); *Britt v. Chestnut Hill College*, 429 Pa.Super. 263, 632 A.2d 557, 561 (1993); *Daughen v. Fox*, 372 Pa.Super. 405, 539 A.2d 858, 860 (1988), *allo. denied*, 520 Pa. 605, 553 A.2d 967 (1988).

Section 46 of the Restatement (Second) of Torts provides:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily harm.

This Court in *Johnson v. Caparelli*, 425 Pa.Super. 404, 625 A.2d 668, 671 (1993), *allo. denied*, 538 Pa. 635, 647 A.2d 511 (1994), held that subsection (2) of Section 46 is applicable to those individuals such as Margaret Taylor, who suffer severe emotional distress as a result of such outrageous intentional conduct as that of Dr. Trinkaus in disregarding the limitations of the consent provided by Margaret Taylor. Margaret Taylor offered substantial evidence at trial to support her claim that Dr. Trinkaus caused her severe emotional distress, including the testimony of two expert witnesses, Dr. Galst and Dr. Goldberg, who testified that Dr. Trinkaus mistakenly entered an artery when inserting the sheath and thereby triggered a cardiac arrhythmia that resulted in Ka–Rin's death. Ms. Taylor reasonably believed that Dr. Trinkaus purposefully misled her as to who would perform the procedure and then caused or contributed to Ka–Rin's death when he performed the procedure himself, despite his previous assurances to her to the contrary.

Ms. Taylor also established that she suffered physically ascertainable injuries as a result of Dr. Trinkaus's outrageous conduct. *See: Hunger v. Grand Central Sanitation*, *supra*. Brenda Pemberton, Ms. Taylor's treating psychologist, testified that the "incident surrounding [Ka–Rin's] death ... seemed to be the focus of [Ms. Taylor's] very existence," and was the cause of her panic attacks, depression, insomnia, lethargy and unusual sadness. Ms. Pemberton testified that Ms. Taylor suffered from dysthymia, an ongoing depression, which required continuing treatment and might in the future necessitate in-patient hospitalization.

Ms. Taylor herself described how her emotional distress resulted in an inability to perform the requirements of her job and presented the testimony of her former supervisor, Mr. Curtis Ingram, assistant operations director for the City of Philadelphia's Youth Study Center. Mr. Ingram testified that, although Ms. Taylor, a youth detention counselor, had been "an excellent person, an excellent and bright and very capable person," prior to the death of her daughter:

> ... I watched a person who was able to deal with tough kids lose all sense of concentration; a total inability to talk; inappropriate crying; spending most of her time writing the name Ka–Rin on paper. She essentially became a liability to me. I was more afraid of her hurting herself or one of the kids hurting her, which resulted in a decision being made, because we thought that it was a grieving process, and that after the grieving process, she would return back to the person that we had hired.
>
> Essentially, that did not happen.
>
> It was my decision, along with her supervisor, to move her off of the floor. As I stated, essentially, she was hired to work with children, but because of the flip-flop in her whole affect, it was our decision to take her off the floor, to put her in a position where we felt she would not be such a liability.
>
> Q. And where did you put her?
>
> A. We put her in an area we call center control. And that's an area where the basic duties are to answer telephones and push some paper around.
>
> Q. And how does she perform – did she perform in that job?
>
> A. Very pathetic, in a sense that, it was near my office and oftentimes you would hear the phone ring maybe 8, 9, 10 times, which was a signal that maybe no one was there. And I would go down and she would be sitting there, again, doodling, writing, you know, the name Ka–Rin, and the phone would be ringing. Again, crying, inappropriate crying.

I talked with her. I brought her into my office a number of times to talk with her about the possibility and the probability of getting some psychotherapy, because I thought it was unusual that the grieving process was lasting so long, and that it had such a devastating effect, you know, upon this lady.

> But what I observed in terms of my observation was that this lady was devastated, and, as I stated, her entire affect just changed. It became blunted. She was a very keen, sharp person who became a very blunted, closed, dark person; and I also watched this lady age before my eyes....
>
> She started graying; she started, her skin looked ashen. She wasn't taking care of herself. She just started to look old.

Contrary to the argument of Dr. Trinkaus, we find ample support in the record to support the decision of the learned trial court judge to deny the motion for judgment n.o.v. as to the verdict based on intentional infliction of emotional distress.[11] As Judge Cohen noted:

> Dr. Trinkaus testified that he informed the family that he had limited experience regarding this procedure. The family expressed some reservations about the administration of the catheterization. At some point shortly thereafter, Dr. Wertheimer was summoned to speak with the family and explain the procedure. According to Margaret Taylor, Dr. Trinkaus asserted that Dr. Wertheimer, a cardiologist highly experienced in administering Swan–Ganz catheters, would actually perform the procedure at the appropriate time. Following the discussions with Dr. Wertheimer, and at no time prior thereto, Margaret Taylor and Lewis Mapp consented to the procedure. Following the family's consent, the less experienced Dr. Trinkaus administered the required catheter. Ka–Rin Taylor died shortly thereafter.
>
> The jury could have concluded, based upon the recitation of facts above, that it was clearly meritless.

---

**11.** While the challenge to the verdict as excessive is moot due to the necessity for a new trial, it is

outrageous for the less experienced Dr. Trinkaus to perform the Swan–Ganz procedure. . The Swan–Ganz procedure is an invasive surgical operation. This court can conceive of no more important decision than determining whom shall invade the body of a loved one with surgical instruments. Certainly in the present case, this decision was made only after thoughtful consideration and a cardiologist's explanation of the risks involved. Dr. Trinkaus alone could not obtain the requisite consent. It is this court's opinion that by subsequently performing this invasive procedure, .notwithstanding the family's obvious concerns, Dr. Trinkaus's actions were outrageous in nature. There was ample support for the jury to conclude the same.

We agree and thus reject this claim of error.

As the remaining arguments urged upon us by the parties have been rendered moot by our award of a new trial on all issues, we vacate the judgment entered on the verdict and remand for a new trial.

Judgment vacated. Case remanded. Jurisdiction relinquished.

BECK, J., files a concurring and dissenting opinion.

BECK, J., concurring and dissenting.

I agree with so much of the majority's well-reasoned Opinion as decides the questions of informed consent and punitive damages. I must dissent, however, from the majority's determination of the issue of intentional infliction of emotional distress.

Although the Pennsylvania courts have not expressly adopted a cause of action for intentional infliction of emotional distress, case law indicates when and if Pennsylvania adopts the cause of action, recovery would require the plaintiff to allege facts sufficient to make out the elements set forth in the Restatement (Second) of Torts § 46. *See Kazatsky v. King David Memorial Park*, 515 Pa. 183, 527 A.2d 988 (1987).

In the instant case, the majority correctly finds that subsection 2 of Restatement § 46 is applicable:

(2) Where such [extreme and outrageous] conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family *who is present at the time* whether or not such distress results in bodily harm. . . .

(Emphasis added). Although mother of the decedent Margaret Taylor was present in the hospital waiting room while the surgeons worked on her daughter, she did not learn of the alleged outrageous conduct, *i.e.*, that Dr. Trinkaus performed the catheterization contrary to his representation that Dr. Wertheimer would do so, until after the fateful events had taken place. She was not present in the room where the procedure took place, she was not a witness to Dr. Trinkaus's conduct, and this small detail has always been cited as a required element in cases involving family. members seeking recovery under Restatement section 46(2). *Baker v. Morjon, Inc.*, 393 Pa.Super. 409, 574 A.2d 676, 679 (1990); *Daughen v. Fox*, 372 Pa.Super. 405, 539 A.2d 858, 861 n. 2 (1988).

The rationale for the requirement of presence has been explained in cases discussing the tort of *negligent* infliction of emotional distress:

"[T]he relative who contemporaneously observes the tortious conduct has no time to brace his or her emotional system. The negligent tortfeasor inflicts upon this bystander an injury to the victim. Hence the critical element for establishing such liability is the contemporaneous observance of the injury to the close relative."

*Krysmalski v. Tarasovich*, 424 Pa.Super. 121, 622 A.2d 298, 304 (1993) (quoting from *Mazzagatti v. Everingham*, 512 Pa. 266, 279, 516 A.2d 672, 679 (1986)). *See also Bloom v. Dubois Regional Med. Center*, 409 Pa.Super. 83, 597 A.2d 671, 682 (1991) (to recover for negligent infliction of emotional distress, plaintiff must observe defendant traumatically inflicting harm on plaintiff's relative with no buffer of time or space to soften the blow).[1]

The cases thus far decided, however, have limited such liability to plaintiffs who were pres-

---

1. Comment L to Restatement section 46 further discusses the requirement of presence:

I do not read *Johnson v. Caparelli*, 425 Pa.Super. 404, 625 A.2d 668 (1993), as allowing recovery by Margaret Taylor under these facts. Indeed, in *Johnson*, the majority held that the parents of a victim of sexual abuse perpetrated by the defendant could not recover damages for emotional distress under section 46(2) because they were not present at the time the outrageous conduct directed at their son actually took place. I therefore cannot join in the majority's decision on this issue.

James F. Donohue, Butler, for appellant.

James R. Gilmore, Asst. Dist. Atty., Pittsburgh, for Com., appellee.

Before POPOVICH, ORIE MELVIN and BROSKY, JJ.

BROSKY, J.

ent at the time, as distinguished from those who discover later what has occurred. The limitation may be justified by the practical necessity of drawing the line somewhere, since the number of persons who may suffer emotional distress at the news of an assassination of the President is virtually unlimited, and the distress of a woman who is informed of her husband's murder ten years afterward may lack the guarantee of genuineness which her presence on the spot would afford. The Caveat is intended, however, to leave open the possibility of situations in which presence at the time may not be required.