Richard P. O'NEILL

v.

**SEARS, ROEBUCK AND COMPANY.**

No. Civ.A. 97–3767.

United States District Court,
E.D. Pennsylvania.

July 28, 2000.

George P. Wood, Stewart Wood & Branca, Norristown, PA, Carmen R. Matos, Stewart, Wood and Branca, Norristown, PA, for Richard P. O'Neill.

Craig S. Hudson, Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, PA, Colleen Bannon, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, Thomas C. De Lorenzo, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, for Sears.

### MEMORANDUM AND ORDER

HART, United States Magistrate Judge.

On January 25, 2000, after a five day trial, the jury returned a verdict for the plaintiff in this age discrimination suit and awarded the plaintiff $519,068 in damages.[1] Presently before the court is the defendant's Motion for Judgment as a Matter of Law or in the Alternative New Trial or in the Alternative Remittitur. For the reasons that follow, the defendant's motion will be Denied.

### I. Facts

The plaintiff worked as a technician for Sears, repairing appliances in customers' homes, for 22 years before his termination in 1996. Throughout the trial, Sears contended that Mr. O'Neill was terminated for falsifying time records regarding the customer service stops he made on his route in North Philadelphia and the time he completed his work on March 7, 1996. The plaintiff presented testimony that it was customary that technicians working in the North Philadelphia area would forego their breaks and lunch and complete the required paperwork after leaving the "sensitive" area in order to minimize risks to the technicians and equipment. (N.T. 1/19/2000, vol. 1, 63–64; 1/19/2000, vol. 2, 92–93; 1/20/2000, 209–211). The plaintiff brought this suit claiming that age played a determinative role in his termination, based on statements made to him at the time of his discharge. In addition Mr. O'Neill presented evidence that two younger, less-experienced technicians, who had handled their work in North Philadelphia in a similar manner, were retained.

1. In finding that the defendant violated the Age Discrimination in Employment Act, ("ADEA") and the Pennsylvania Human Relations Act, ("PHRA"), the jury awarded $106,736 in back pay, $130,596 in front pay, and $175,000 in compensatory damages pursuant to the PHRA. (N.T. 1/20/2000, 118–120). In addition, the jury found that the defendant willfully violated the ADEA. (N.T. 1/24/2000, 119). Therefore, the award for backpay was doubled by the court. Finally, the litigants agreed to allow the court to consider the plaintiff's argument that he should be awarded damages resulting from the tax consequences of receiving the economic damages in a lump sum, rather than over the number of years plaintiff would have worked, but for his premature termination. The court will consider the plaintiff's motion to mold the verdict to consider these tax consequences in a separate opinion.

## II. Mixed Motives Charge

The defendant claims that the evidence presented at trial was insufficient to warrant a mixed motives charge. Where the plaintiff possesses direct evidence of discrimination, he may pursue a "mixed motives" theory of recovery. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

██ Prior to trial, Sears argued that Mr. O'Neill was not entitled to proceed under a mixed motives analysis. However, relying on Mr. O'Neill's deposition testimony, the court denied the defendant's motion. In his deposition, Mr. O'Neill recounted a conversion with George Finlayson, his district manager, in which Mr. Finlayson stated, "you're 55 [years of age] and [have] 20 [years of service], so we're terminating you." (O'Neill Deposition, at 58–60). In this court's opinion, we found such a statement akin to other "quintessential" examples of direct evidence of discrimination, warranting a mixed motives charge. *O'Neill v. Sears*, No. 97–3767, Memorandum and Order, 1/10/2000, at 6.

Although Mr. O'Neill's recitation of the conversation was not quite as damning at trial, we again conclude that the testimony, if believed by the jury, was sufficient to qualify as direct evidence of discrimination, warranting a *Price Waterhouse* charge. At trial, Mr. O'Neill testified that at a March 18 meeting, Mr. Finlayson asked him "are you 55 and 20 or are you ready to retire?" (N.T. 1/19/2000, 14). In addition, the jury heard testimony from the plaintiff recounting a March 25, 1996, telephone call he received from Mr. Finlayson, during which Mr. Finlayson asked Mr. O'Neill if he was 55 years old and if he had 20 years of service with Sears. (N.T. 1/19/2000, 16–17). When Mr. O'Neill responded affirmatively, he testified that Mr. Finlayson then said, "Well, we decided to terminate you." (N.T. 1/19/2000, vol.1, 17, 84). Although Mr. Finlayson did not remember the telephone conversation, he did remember asking Mr. O'Neill if he was old enough to retire at the March 18 meeting. (N.T. 1/19/2000—vol.2, 39).

The Third Circuit has held that direct evidence required for a *Price Waterhouse* charge is "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting a discriminatory attitude." *Hankins v. City of Philadelphia*, 189 F.3d 353, 364 (3d Cir.1999) (citing *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1090 (3d Cir. 1995)). According to Mr. O'Neill, the only conversation had between him and Mr. Finlayson, during the telephone call when Mr. O'Neill was informed of his termination, involved his age and years of service. Moreover, Mr. Finlayson's announcement of Sears' decision to terminate plaintiff was made *immediately* after Mr. O'Neill answered "yes" to Mr. Finlayson's questions about plaintiff's age and years of service. To require a grammatical connector such as "well, in the case" to precede Mr. Finlayson's statement would be like writing the word "horse" under a picture of a horse. Thus, if his testimony was believed, Mr. O'Neill was given no other reason for his termination at that time other than a combination of his years of service *and* his age. Mr. Finlayson's statements "may be viewed as directly reflecting a discriminatory attitude."

In instructing the jury, the court left the ultimate determination to the fact-finders.

> I instruct you that a statement made to the plaintiff by a person with decision-making authority can constitute the necessary direct evidence of age discrimination; however, it will be up to you to decide exactly what Mr. Finlayson said to Mr. O'Neill, whether such statements were motivating factors in Sears' decision and what role Mr. Finlayson played in Sears [sic] decision to terminate the plaintiff.

(N.T. 1/24/2000, 98).

Sears argues that Mr. Finlayson's questions regarding Mr. O'Neill's age and years of service were for the purpose of determining Mr. O'Neill's pension eligibili-

ty. Such a termination, Sears contends, does not violate the ADEA. "A termination resulting from an age correlated factor is not a termination because of age." *Armbruster v. Unisys Corporation,* 32 F.3d 768, 780 (3d Cir.1994) (citing *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)).

The Supreme Court's decision in *Hazen Paper* is inapposite. In *Hazen Paper,* the employee was terminated just prior to vesting in the pension plan and the Court found that termination to prevent such vesting, while violative of ERISA, did not violate the ADEA. "[A] decision by the company to fire an older employee solely because he has nine-plus years of service and therefore is 'close to vesting' would not constitute discriminatory treatment on the basis of age." *Hazen Paper,* at 604, 113 S.Ct. 1701. Additionally, vesting in the *Hazen Paper* pension plan had no age component, requiring only ten years' of service. "Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Id.*

The question posed in our case, however, does depend on age combined with years of service. *Hazen* 's holding, therefore, is not controlling in this case. In fact, a situation like the present case, was specifically excluded from the Supreme Court's holding in *Hazen Paper.* "[W]e do not consider the special case where an employee is about to vest in pension benefits as a result of his age, rather than years of service." *Id.* Finally, as indicated above, Mr. Finlayson's question about plaintiff's age and years of service was asked and answered only seconds before Mr. Finlayson announced Sears' termination decision—a far different fact scenario than was present in *Hazen Paper.*

Similarly, Sears' reliance on the Third Circuit's decision in *Armbruster* is misplaced. In fact, the Third Circuit's evaluation of the age related comment in *Armbruster* actually lays a foundation for the plaintiff's argument that Mr. Finlayson's comments did constitute direct evidence of a discriminatory animus. Rather than addressing the question left unanswered in *Hazen Paper,* (whether termination to eliminate an age based pension would violate the ADEA), the Third Circuit held that a comment regarding the plaintiffs' ages and salaries, "fifty and fifty," did not constitute direct evidence of discriminatory animus because the statement was not attributable to a "decision maker," and was too remote in time from the alleged discriminatory activity. *Armbruster,* at 778. By avoiding the discrimination issue on the basis that the statement came remote in time from a non-decision maker, the court in *Armbruster* left open the issue presented in this case. Here, the plaintiff provided ample evidence to establish Mr. Finlayson's input into the decision making process for him to qualify as a decision-maker, (N.T. 1/19/2000, vol. 2, 17; 1/20/2000, 17–181 1/21/2000, 19), and the statement was made during the very conversation when Mr. O'Neill was told that his employment was terminated.[2]

Since the plaintiff presented evidence of statements that could be viewed as evidencing a discriminatory attitude, made by a decision-maker, at the time the plaintiff was terminated, we properly included a direct evidence charge, allowing the jury to decide if Mr. Finlayson's alleged statements evidenced the requisite discriminatory attitude.

### III. Testimony of John Brown

The defendant also contends that the court erred in allowing John Brown to

---

**2.** Based on the evidence of Mr. Finlayson's involvement in the decision making process, the court instructed the jury that the plaintiff had proven that Mr. Finlayson was a *decision* maker for purposes of the *Price Waterhouse* requirements. (N.T. 1/24/2000, 99). Although the defendant argued throughout the trial that Mr. Finlayson was not a "decision maker," the issue was not presented in the defendant's current motion.

testify. Mr. Brown had been the union shop steward until shortly before Mr. O'Neill's termination. According to the defendant, the plaintiff failed to identify Mr. Brown as a witness until the filing of the Pretrial Stipulation, two weeks before trial. (Defendant's Memorandum of Law, at 3). Additionally, the defendant argues that plaintiff's counsel misrepresented the testimony that Mr. Brown would present. The plaintiff argues that he identified Mr. Brown three weeks prior to trial when the draft of the Pretrial Stipulation was first circulated and further argues that any error was harmless.

Federal Rule of Civil Procedure 37(c)(1) provides the sanctions for failing to comply with the rules governing the disclosure of witnesses and material.

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence ... any witness or information not so disclosed.

Fed.R.Civ.P. 37(c)(1). The imposition of sanctions pursuant to Rule 37(c)(1) is within the sound discretion of the trial court. *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 156 (3d Cir.1995). However, "[t]he exclusion of critical evidence is an extreme sanction, not normally imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir.1997) (quoting *Meyers v. Pennypack Woods Home Ownership Association*, 559 F.2d 894, 905 (3d Cir.1977)).

In reviewing Rule 37(c) sanctions, the Third Circuit has considered the following: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or other cases in the court, and (4) bad faith or willful-

ness in failing to comply with the district court's [discovery] order.

*Id.*

In this case, much of Mr. Brown's testimony was merely duplicative of that given by Andrew Johnson, the shop steward at the time of Mr. O'Neill's termination. The only additional evidence offered by Mr. Brown involved a conversation that he had with Joseph Miller, a unit manager at the time of Mr. O'Neill's termination. In his testimony, Mr. Brown testified that Mr. Miller explained that Mr. O'Neill's termination did not have the same effect that such a termination would have on the younger workers.

> The fact that he had reached an age that he could enjoy those retirement benefits, that it wouldn't have such a profound effect economically on Mr. O'Neill as it would be on a 28 year old fellow that still had a whole career ahead of him of work and potential earnings and everything.

(N.T. 1/20/2000, 219). It is this portion of the testimony that the defendant claims caused irreparable prejudice.

■ Evaluating the testimony and the circumstances surround Mr. Brown's untimely identification, we conclude that the court properly refused to exclude Mr. Brown's testimony. The testimony in question was somewhat prejudicial, but not to the extent that the defendant would like the court to believe. There was no evidence that Mr. Miller, to whom the allegedly prejudicial statement was attributed, was involved in Mr. O'Neill's termination.

More importantly, however, defense counsel made no attempt to cure any prejudice by questioning Mr. Brown concerning his knowledge of the events surrounding Mr. O'Neill's termination. Plaintiff's counsel identified the witness three weeks prior to trial. Mr. Brown is an employee of Sears, so the court has no reason to question the defendant's access to this witness. At the final pretrial conference, held immediately before the start of the trial,

the court informed defense counsel that Mr. Brown's testimony would be permitted and that he could depose Mr. Brown before he was called to testify. Mr. Brown did not testify until the third day of trial. Yet, defense counsel did not avail himself of the opportunity to question Mr. Brown about his knowledge concerning Mr. O'Neill's termination, either during the three weeks prior to trial after he was put on notice, or after the court's ruling. Since defense counsel had sufficient time to question this witness prior to trial to minimize any prejudice, the court correctly refused to bar the witness. *See Robert Billet Promotions, Inc. v. IMI Cornelius, Inc.*, No. 95–1376, 1998 WL 721081 *8 (E.D.Pa. Oct.14, 1998).

Finally, the defendant claims that the court should have stricken the testimony in question because there was no evidence that Mr. Miller was speaking as a representative of the defendant when he was allegedly speaking to Mr. Brown. Although Mr. Brown testified that he and Miller were friends, he stated that he discussed issues with Mr. Miller both as a friend and as a shop steward to a manager. (N.T. 1/20/2000, 218). With regard to the testimony in question, the court specifically stated, "[y]ou can testify what he said if he was talking at the time as a manager of Sears." (N.T. 1/20/2000, 218). After this admonition, Mr. Brown said that Mr. Miller made the comment referring to Mr. O'Neill's age and retirement status.

### IV.  Evidence of Disparate Treatment

■ Mr. O'Neill's discrimination case proceeded under both a mixed-motives analysis, as previously discussed, and a pretext analysis. "When a plaintiff alleges disparate treatment, 'liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.'" *Reeves v. Sanderson*

*Plumbing Products, Inc.*, —— U.S. ——, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)). In support of Mr. O'Neill's pretext case, after satisfying the prima facie requirements, he presented evidence from which the jury could reject Sears' proffered reason for his termination and conclude that age motivated Sears' decision. Mr. O'Neill not only presented evidence that the very action for which he was terminated was the custom and practice of the technicians working in sensitive areas, but he also presented two examples of younger individual whom Sears had caught doing the same thing. Yet, these two technicians, Sal Luongo and Raymond Clark, were not terminated for their actions.

The defendant does not take issue with the testimony regarding the customary practice. However, the defendant does argue that Mr. Luongo and Mr. Clark cannot be considered similarly situated to Mr. O'Neill for purposes of comparison. Both Mr. Luongo and Mr. Clark were dues paying members of the union who sought the help of the union regarding their discipline. Mr. O'Neill testified that he had not paid dues to the union for 20 years. (N.T. 1/19/2000, 77). When he sought the union's help in filing a grievance, the union refused to represent him.[3] (N.T. 1/19/2000, 78). The union's assistance, the defendant contends, differentiates Mr. O'Neill from Mr. Clark and Mr. Luongo.

Contrary to the defendant's theory, despite plaintiff's failure to pay dues, the union had the same obligation to represent Mr. O'Neill as it did to represent every other member of the bargaining unit. (N.T. 1/20/2000, 133). Indeed, for the union to discriminate against a non-dues payer would be a blatant violation of the Na-

---

3. According to Andrew Johnson, the shop steward, because Mr. O'Neill had failed to pay his union dues, he would have to pay for arbitration, had it been necessary, and Mr. O'Neill chose not to do so. (N.T. 1/20/2000,

133). Neither Mr. Luongo, nor Mr. Clark were required to go to arbitration. By agreement of the union and the defendant, both received suspensions. (N.T. 1/20/2000, 65, 200–201).

tional Labor Relations Act. The fact that the union may have unlawfully failed to represent Mr. O'Neill to the extent that it did the two younger technicians should not cut in Sears' favor. To accept such an argument would allow two wrongs to make a right.

Furthermore, the court allowed the defense to present evidence concerning the dues paying status of all three men. In fact, defense counsel argued to the jury that dues paying union status explained the difference in the disciplinary measures that each man received.

> And there was no pressure put on us by the union about Mr. O'Neill's termination. It was dropped. So our termination stood. Unlike Luongo and unlike Clark where the union did bring pressure to bear. . . . It does not mean that Mr. O'Neill was discriminated [against] because of his age. If he was being treated differently, maybe the union was the one treating him differently, and that was a factor in this.

(N.T. 1/24/2000, 75). Based on the jury's verdict, however, this argument was obviously rejected.

█ In order to be deemed similarly situated, the Sixth Circuit has held that the comparators should have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct. Here, Mr. Clark testified that he received a two week suspension, without pay, the second time he was disciplined for going home early and falsifying his route sheet and time card.[4] (N.T. 1/20/2000, 141–143, Plaintiff's Exhibit 44). At the time he received this suspension, he was 29 years old.

Similarly, Mr. Luongo, also 29, received a two week suspension, without pay, for "theft and dishonesty," when he returned home early after finishing his route in North Philadelphia. Like Mr. O'Neill, Mr.

Luongo was merely following the practice of completing the route and finishing the paperwork at home. (N.T. 1/20/2000, 197–200). Mr. Luongo had received several warnings concerning such actions. (Plaintiff's Exhibit 36).

Sears also argues that the younger employees are not true comparators because they had different supervisors than Mr. O'Neill. Mr. O'Neill testified that his direct supervisor was Joseph Miller and Mr. Finlayson was the manager in charge of the Eastern Seaboard of Sears. (N.T. 1/19/2000, vol.1, 12–13). However, Mr. Partridge is the one who took Mr. O'Neill's keys and suspended him indefinitely on March 8, 1996. (N.T. 1/19/2000, vol.1, 10–11).

The plaintiff presented evidence that the same supervisors were involved with the discipline of the other men. Mr. Finlayson's signature appears on the memorandum documenting Mr. Clark's suspension. (Plaintiff's Exhibit 44). Additionally, Mr. Miller was in attendance at the meeting during which it was determined that Mr. Clark would receive only a suspension. (Plaintiff's Exhibit 44). Similarly, Mr. Miller and Mr. Partridge were present when Mr. Luongo was disciplined and their signatures appear on the "Memorandum of Deficiency." (N.T. 1/20/2000, 201; Plaintiff's Exhibit 36).

Unlike his younger colleagues, the discipline meted out to Mr. O'Neill for his second offense was termination. This evidence was sufficient to allow the issue of whether "willful misconduct" was merely a pretext for age discrimination to go to the jury.

Considering the direct evidence of discrimination and the plaintiff's evidence in support of his pretext case, the court concludes that there was sufficient evidence to support the jury's finding of discriminato-

---

4. There is some question whether Mr. Clark received a two week suspension or a 30–day suspension. (N.T. 1/20/2000, 65, 143).

ry animus and the jury's verdict with respect to the ADEA and the PHRA.

## V. PHRA Limitations

The defendant again argues that the plaintiff failed to timely file his administrative appeal with the Pennsylvania Human Relations Commission. Considering the many possible termination dates in this case: plaintiff's suspension on March 8; a meeting with Mr. Finlayson on March 18; the telephone conversation with Mr. Finlayson on March 25; and the date appearing on the approval to terminate form— April 9, the court left this factual issue to the jury.

The jury was instructed:

Pursuant to the PHRA, in order to successfully claim discrimination, the plaintiff must file a complaint with the Pennsylvania Human Relations Commission within 180 days of the alleged act of discrimination.

In this case, the alleged act of discrimination was plaintiff's termination by Sears. As you know from having heard the testimony, there is a dispute as to when the plaintiff first learned of his termination.

Now, it is undisputed that the plaintiff filed his claim with the PHRA on September 20th, 1996. You have heard conflicting testimony concerning when Mr. O'Neill first learned he was fired. It is for you to decide what that date was.

If you find that the plaintiff has proven by a preponderance of the evidence that Mr. O'Neill did not learn of his termination until after March 23rd, 1996, that by the way, March 23rd is 180 days before September 20th, so even though nothing has happened on that date, I think it might have been a weekend.

[sic] That's the date. That is the cutoff date. So if you find that he did not learn of his termination until after March 23rd, 1996, and that he was unlawfully discriminated against on the basis of his age, then the plaintiff has sustained his Pennsylvania Human Relations Act claim and is entitled to the damages provided for in that act which I will explain to you shortly.

If you find that the plaintiff learned of his termination on or before March 23rd, 1996, then the statute of limitations bars the Pennsylvania Human Relations Act claim and the plaintiff is not entitled to damages provided for by that state law.

(N.T. 1/24/2000, 110–110).

Pursuant to that instruction, the jury found that the plaintiff was terminated after March 23, 1996.[5] (N.T. 1/24/2000, 119). As such, the PHRA charge was timely filed because, as previously stated, it is undisputed that Mr. O'Neill filed his PHRA claim on September 20, 1996, within the 180 day period of the termination date found by the jury.

## VI. Excessive Compensatory Damages

■ The defendant claims that the jury's award of $175,000 in compensatory damages was excessive and was influenced by passion, prejudice, and/or sympathy. The district court may review a damage award for excessiveness. *Kazan v. Wolinski,* 721 F.2d 911, 914 (3d Cir.1983). A motion for remittitur is left to the sound discretion of the trial judge, who is in the best position to evaluate the evidence and determine whether the jury has come to a rationally based award. *Spence v. Board of Education,* 806 F.2d 1198, 1201 (3d Cir. 1986). When the jury's award is clearly unsupported or excessive, and where no clear judicial error can be identified, the

5. It bears mentioning that throughout the trial, Sears argued that Mr. Finlayson did not have the authority to terminate employment and that he had to seek the approval of his superiors. Yet, for purposes of determining the date of termination for purposes of the PHRA, Sears argues that the dates of Mr. Finlayson's actions prior to the return of the "Approval to Terminate" form constitute the date of Mr. O'Neill's termination. Considering the conflicting testimony, the court determined that the date of termination was a factual issue best left to the jury.

court should order the plaintiff to remit a portion of the verdict in excess of the maximum amount supported by the evidence or, if remittitur is refused, to submit to a new trial. *Id. See also, Kazan,* at 914. In an ADEA case, "[a] remittitur is in order when a trial judge concludes that a jury verdict is 'clearly unsupported' by the evidence and exceeds the amount needed to make the plaintiff whole, i.e., to remedy the effect of the employer's discrimination." *Starceski v. Westinghouse Electric Corp.,* 54 F.3d 1089, 1100 (3d Cir.1995) (citing *Spence,* at 1201). Remittitur is appropriate only when the jury's verdict is so large as to "shock the conscience" of the court. *Id.*

█ The defendant submits that $175,000 in compensatory damages is excessive considering the fact that the plaintiff did not seek any medical or psychological care. It is well settled under Pennsylvania law that medical evidence need not be produced to sustain an award of compensatory damages when damages are "direct, obvious, and foreseeable results of an injury … even when the bodily injury is minor or trivial in character." *Montgomery v. Bazaz–Sehgal,* 742 A.2d 1125, 1132 (Pa.Super.1999). This is true even when the damages are awarded for emotional distress as long as the jury could reach "a fair and competent determination of compensatory damages in the absence of medical testimony, based on the evidence adduced at trial, even where the injury to the plaintiff is intangible." *Bannar v. Miller,* 701 A.2d 242, 251 (Pa.Super.1997).

The Third Circuit has explained that the burden of proving damages is on the plaintiff to establish "that there was a reasonable probability, rather than a mere possibility, that damages due to emotional distress were in fact incurred." *Spence,* at 1201. In *Spence,* the Third Circuit found that the testimony of plaintiff, alone, that she "was depressed and humiliated and that she lost her motive to be creative," was insufficient to meet the burden.

*Id.* However, the Third Circuit has upheld a $250,001 award for emotional damages in a civil rights case (involving the plaintiff's discharge from employment) based on the testimony of the plaintiff's wife and daughter. *Bolden v. SEPTA,* 21 F.3d 29, 33 (3d Cir.1994). "[W]e are persuaded that the approach taken by our sister circuits which have dispensed with a requirement of expert testimony to corroborate a claim for emotional distress is more consistent with the broad remunerative purpose of the civil rights laws." *Id.,* at 34.

Relying on the reasoning in *Bolden,* the District Court upheld and award of compensatory damages pursuant to the PHRA in an age discrimination suit. *Becker v. ARCO,* 15 F.Supp.2d 600 (E.D.Pa.1998) (reversed on other grounds). In support of his compensatory damages, Becker testified that he was humiliated when he was escorted from his place of employment, he "felt stupid, and was distressed at the prospect of informing his wife of his termination." *Becker,* at 609. Becker's son testified that his father had "lost weight, appeared pale, and seemed to age at least ten years" and described his father's inability to participate in family gatherings and spoke of the strained relationship between his parents. *Id.*

Similarly, Mr. O'Neill described his world as "turned upside down" when he was fired. (N.T. 1/19/2000, vol.1, 17). He stated that he couldn't eat or sleep and became "grumpy and irritable" towards his wife and children. He described a "rotten" feeling because he couldn't take his wife on vacation. He also had testified that shortly before his termination, he and his wife had purchased a new house and had a mortgage to pay. (N.T. 1/19/2000, vol.1, 35, 41). In addition, Mr. O'Neill testified that he and his wife "did without" medical benefits for nearly three years because they could not afford them. (N.T. 1/19, 2000, vol.1, 29–30).

Nellie O'Neill, the plaintiff's wife, testified that her husband went from being "a fun guy" to "a zombi" [sic] after his termi-

nation. He became argumentative, couldn't eat, and didn't sleep well. (N.T. 1/19/2000, vol.2, 100–101). He didn't get together with family as much and "just kind of keeps to himself more," (N.T. 1/19/2000, vol.2, 103). Finally, Gregory O'Neill, the plaintiff's son, stated that it looked like his father had aged 20 years overnight. (N.T. 1/1/00, vol.1, 30).

■ Considering the Third Circuit's decision in *Bolden,* the District Court's decision in *Becker,* and the similarity in the type of testimony presented by Mr. O'Neill, evidencing the physical and emotional effects his termination had, the court will deny the defendant's motion for remittitur.

### VII. Willfulness

Finally, the defendant claims that the jury's finding of a willful violation of the ADEA is unsupported by the evidence. A violation of the ADEA is willful "if the employer either 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.'" *Starceski v. Westinghouse Electric Corp.,* 54 F.3d 1089, 1098 (3d Cir.1995) (quoting *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 612, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)). After receiving instructions consistent with this standard, (which were not challenged by the defendant), the jury found that Sears willfully violated the ADEA. (N.T. 1/24/2000, 103–104; 119).

■ In reviewing the jury's determination of willfulness, we must view the evidence in the light most favorable to the verdict winner, Mr. O'Neill. *Id.,* at 1099 (citing *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 450 (8th Cir.1993)). Doing so, the court concludes that the plaintiff presented sufficient evidence to support the jury's determination. Mr. Finlayson admitted that he was familiar with the ADEA and its requirements and protections. (N.T. 1/19/2000, vol.2, 69–70). During the trial, the jury heard numerous witnesses testify that the custom and prac-

tice when working in North Philadelphia was to finish the calls as quickly as possible, foregoing breaks and lunch and leave the area as early as possible. (N.T. 1/19/2000, vol. 2, 92–93; 1/20/2000, 59–60, 88–92; 209–210; 215–216). Yet, Mr. O'Neill, an older employee, was terminated for doing just that. When Mr. Johnson, the shop steward, discussed the unprecedented discipline to which Mr. O'Neill was subject with Mr. Finlayson, the discussion turned to Mr. O'Neill's age in relationship to his eligibility to retire. (N.T. 1/20/2000, 111–112). The only discussion that Mr. Finlayson had with Mr. O'Neill when he told Mr. O'Neill that he was terminated involved Mr. O'Neill's age and years of service. (N.T. 1/19/2000, vol.1, 17). Finally, Mr. Brown, the former shop steward, testified that Mr. Miller, a unit supervisor, commented that because Mr. O'Neill had reached retirement age, his termination "wouldn't have such a profound effect economically … as it would [have] on a 28 year old fellow that still had a whole career ahead of him." (N.T. 1/20/2000, 219). Considering this evidence, along with the comparator evidence previously discussed, the jury could reasonably find that Sears either "knew or showed reckless disregard" for its statutory duty imposed by the ADEA. *Starceski,* at 1099.

An appropriate order follows.

### ORDER

AND NOW, this 28 day of July, 2000, upon consideration of the Defendant's Motion for Judgment as a Matter of Law or in the Alternative New Trial or in the Alternative Remittitur, the Plaintiff's response, thereto, the supplemental filings, by both parties, and after careful review of the trial transcript, IT IS HEREBY ORDERED that the Defendant's Motion is DENIED.